# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,

v.

CUITLAHUAC TAHUA RIVERA,
Defendant and Appellant.

S153881

Colusa County Superior Court
CR46819

May 23, 2019

Justice Liu authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Cuéllar, Kruger and Groban concurred.

PEOPLE v. RIVERA

S153881


Opinion of the Court by Liu, J.


Defendant Cuitlahuac Tahua Rivera was convicted and sentenced to death for the murder of Stephan Gene Gray, a peace officer. (Pen. Code, §§ 187, 189.) The jury found true special circumstance allegations that (1) the murder was committed for the purpose of avoiding or preventing a lawful arrest, or perfecting or attempting to perfect, an escape from lawful custody; and (2) the murder involved the intentional killing of a peace officer engaged in the course of his duties. (Pen. Code, § 190.2, subd. (a)(5), (a)(7).) The jury found not true the special circumstance allegation that the murder was committed as a member of and to further the activities of a criminal street gang. (Pen. Code, § 190.2, subd. (a)(22).) Rivera was also convicted and sentenced for two counts of unlawful possession of a firearm by a felon, two counts of shooting at an occupied vehicle, and two stayed counts of assault with a semiautomatic firearm. The jury found true all alleged enhancements, including that the offenses of murder and unlawful possession of a firearm were "committed for the benefit of, at the direction of, or in association with any criminal street gang" for the purposes of Penal Code section 186.22, subdivision (b)(1)'s gang enhancement. This appeal is automatic.

We modify the judgment as to certain fines imposed by the trial court, and we affirm the judgment as modified.

1

# I. FACTS

## A. Guilt Phase

Trial began on April 13, 2007. The prosecution presented evidence, including testimony by Jamilah Peterson, Rivera's girlfriend at the time, and other witnesses, pointing to Rivera as the perpetrator of two shootings on April 11, 2004, and April 15, 2004. The second shooting resulted in the death of Officer Gray of the Merced Police Department. Rivera conceded that he shot and killed Officer Gray while fleeing from a parole search resulting from a traffic stop. Rivera further admitted that he was a member of the Merced Gangster Crips at the time of the shooting. But he denied that the shooting was premeditated, that the shooting was in furtherance of the gang, and that he previously shot anyone else as the prosecution alleged.

### 1. Prosecution Evidence

#### a. Prior Encounters Between Rivera and Officer Gray

The prosecution argued that Rivera and Officer Gray were "very familiar" with one another and "knew each other on sight," based in part on Rivera's membership in the Merced Gangster Crips street gang and Officer Gray's work with the Merced Police Department's gang unit, for which he was assigned to monitor the Merced Gangster Crips. The two individuals had several encounters before the events on April 11, 2004, and April 15, 2004. LaDonna Davis-Turner, who was acquainted with Rivera through a friend, described an "altercation" that occurred when Officer Gray attempted to arrest Rivera in 1999 or 2000. Rivera was drunk, aggressive, and yelling profanities, and Officer Gray had to slam Rivera to the ground to get him under control.

Peterson testified about another encounter during which Rivera abandoned Peterson's car on the side of the road to evade Officer Gray, who had been following him. Peterson called Officer Gray to attempt to get her car back. Officer Gray informed her that he would only return the car if Rivera would speak with him. Peterson subsequently contacted Rivera, but Rivera refused to speak to Officer Gray. On yet another occasion, Officer Gray came to Peterson's house to speak with Rivera. Peterson testified that although Officer Gray was always professional, he would lecture Rivera about how he had a daughter and family, and that it was a bad idea to hang around "with the people he was hanging around with." Officer Gray warned Rivera that he was watching and if Rivera did anything, Officer Gray would come get him. Rivera expressed to Peterson that Officer Gray was always harassing him, and he resented Officer Gray's separate conversations with Peterson about how being associated with Rivera would cause problems in her life. At one point, Peterson suggested to Rivera that perhaps he, rather than Officer Gray, was the source of the problem. Peterson also testified that Rivera and his family told her that Rivera and Officer Gray once had a physical altercation that resulted in Rivera's hospitalization.

### b. Prior Uncharged Conduct

Adel Mohammed, who owned a liquor store in Merced that Rivera visited on the night of April 15, 2004, testified that at some point in 2000 or 2001, Rivera pointed a gun at him and his friend Larry Gonzalez while Mohammed and Gonzalez were sitting in a car outside of a different liquor store. Marlon Bradley, who knew Rivera from childhood, testified to a separate incident that occurred on September 30, 2000. Marlon testified that his brother, Edward Bradley, attended a party at

which a conflict arose between members of two rival gangs, the Merced Gangster Crips and the Merced Bloods.  After the party, Marlon became aware that Rivera had arrived at his home with an individual named Gerard Roberts.  Marlon stepped outside to join his brother and his friend Calvin Huffman.  Marlon testified that Roberts encouraged Rivera to "Hit them niggers." Rivera shot six to eight bullets from a revolver at the three men. Marlon did not have a weapon and believed his brother and Huffman were also unarmed.  Marlon tried to run, fell, continued running into the house after Rivera stopped shooting, and told his mother to call the police.  When the police arrived, Marlon informed them that Rivera shot at him.  Peterson testified that she was not aware of the incident at the liquor store involving Mohammed, but she did overhear Roberts refer to having "taken care" of some members of the Merced Bloods after a party in September 2000.

c.  The Shooting of McIntire and Bianchi on April 11, 2004

Peterson testified that on April 11, 2004, she and Rivera attended a family gathering at Applegate Park.  Rivera left the park in Peterson's car, a Mazda Protegé, accompanied by Rivera's friend (also a member of the Merced Gangster Crips) and Peterson's stepfather.  Rivera did not have a driver's license, registration, or insurance, and Peterson thought he would get in trouble if he was pulled over, but she did not stop him.

Kimberly Bianchi testified that on the same day, she and her boyfriend Aaron McIntire were driving near John Muir Elementary School when they encountered three men in a teal green vehicle at an intersection.  Bianchi and McIntire both

4

testified seeing the men looking at them in a threatening manner and throwing up their hands "like there was a problem."

Bianchi saw the driver display a handgun and fire three shots at them. McIntire saw the driver leaning out the driver's window pointing a handgun at him. As McIntire sped away, he heard three gunshots in quick succession. McIntire sustained a gunshot wound to the ankle.

Bianchi and McIntire identified the teal Mazda Protegé carrying Rivera as the vehicle from which the shots were fired. Officer Frank Bazzar recovered three cartridge casings at the scene of the shooting. Upon inspecting McIntire's car, he noted a bullet hole in the lower portion of the driver's door and a hole in the left side of the rear bumper, as well as a bullet on the back floorboard behind the passenger seat.

Bianchi described the driver as Hispanic with a white tank top and dark, "pouffy" hair. During a photo lineup of six men several months after the incident, Bianchi was unable to pick out the driver (Rivera). While testifying at the preliminary hearing, Bianchi was unsure whether Rivera was the driver. At trial, Bianchi identified Rivera as the driver, testifying that she was now "pretty positive" it was him. McIntire also identified Rivera at trial as the driver and shooter. McIntire averred that he had been "positive" it was Rivera essentially since the day of the shooting, but his testimony at the preliminary hearing was unsure.

Officer Sean Greene, who worked with Officer Gray on the Merced Police Department's gang unit, and Officer Colin Smith, who worked on the Merced Police Department's special operations unit, testified that Rivera's name came up at a meeting on April 13, 2004 as a possible person of interest in the

McIntire shooting. Officer Smith explained that at the time, Rivera was one of just a few Hispanic men associated with the Merced Gangster Crips.

### d. The Shooting of Officer Gray on April 15, 2004

Peterson testified to the incidents leading up to the shooting on April 15, 2004. That day, after being at Peterson's mother's apartment, Rivera asked Peterson to take him to "The Hut." Peterson described The Hut as "a place where people hang out: They gamble, they do drugs, people sell drugs." Peterson drove Rivera and their two-year-old daughter south on Glen Avenue in the direction of The Hut, intending to stop at a gas station first. At a four-way stop, Peterson and Rivera saw and immediately recognized Officer Gray, who was traveling east in another vehicle. Officer Gray turned his car around and followed Rivera and Peterson south. Peterson told Rivera that there was nothing to worry about because she had a license and insurance. Rivera responded, "Mother-fucker, why did — Why is he always bothering me? Why is he harassing me? Why don't he just leave me alone?" Peterson again reassured Rivera that they had nothing to worry about. Peterson did not know Rivera had a gun, nor that as a parolee he could be pulled over and searched at any time.

Using Peterson's cell phone, Rivera called Peterson's father, Anton Martin. Rivera told Martin that Officer Gray was following him and asked if Martin could come "to where we were at." Peterson noticed that Officer Gray turned on his vehicle's overhead lights, and she told Rivera that Officer Gray was pulling them over. Rivera responded: "Why is this mother-fucker . . . harassing me? Why won't he leave me alone?" Peterson pulled over to the side of Glen Avenue. During opening

argument, the prosecution offered three reasons Officer Gray may have stopped Rivera: (1) Rivera was a parolee; (2) when Officer Gray tried to stop Rivera a few weeks earlier, Rivera abandoned his girlfriend's car and fled; and (3) Rivera was a suspect in the shooting of McIntire and Bianchi four days earlier.

As Peterson was pulling the car to the side of the road, Rivera made a second phone call, this time to Clint Ward. Peterson was not sure whether Ward was a member of a gang but knew he was popular among members of the Merced Gangster Crips because he had a car and would drive them to The Hut and elsewhere. Rivera asked Ward to come get him.

After pulling over, Peterson began to step out of the car. Officer Gray instructed her to go back inside. Peterson testified that she initially left the vehicle without thinking, not because she knew Rivera was planning to do something. Officer Gray approached the car, walked around to the passenger side, and asked Rivera to end his phone call. Rivera complied. Officer Gray asked when Rivera had last seen his parole officer, and Rivera replied: "On Monday." Peterson heard someone over a police dispatch radio state that Rivera was clear of any outstanding warrants. Officer Gray asked Rivera to step out of the vehicle to be searched. Rivera did so, but before Officer Gray could search him, Rivera took off running. Officer Gray ran after him. Peterson heard Officer Gray say, "I don't know why you're running. You're going to get caught anyway." Peterson saw Rivera holding his right hand underneath his left arm next to his body as he ran and saw a gun flash. Peterson did not see a gun nor hear gunshots, but she saw Officer Gray fall to the ground.

Yolanda Cabanas lived on Glen Avenue and was visiting a neighbor across the street on the evening of April 15, 2004. Cabanas testified that from her vantage point in front of her neighbor's home, she noticed that an unmarked police car stopped a blue-green car on Glen Avenue. She saw a black woman get out of the car and heard an officer telling her to get back into the car. She heard the officer speaking with another man. Cabanas testified that she then saw a man, whom she identified in court as Rivera, running away. She saw him look over his left shoulder, pull out a gun from above his waistline, and turn 90 to 180 degrees to the right toward the officer. The officer did not have a weapon drawn. Cabanas testified that she saw Rivera turn with the gun in his hand and point the gun at Officer Gray. Cabanas heard a gunshot. Officer Gray kept running, and a few seconds later, Cabanas heard a second gunshot. Cabanas saw Officer Gray take three more steps toward Rivera. She thought Officer Gray was nearly close enough to "grab him" when he fell.

Natasha Velasquez was driving with her boyfriend on Glen Avenue at the time these events took place. She testified that she saw a man turn his upper torso to the right and point a gun at a police officer who was chasing him. Velasquez heard two gunshots and saw the officer fall to the ground. Michael Clary and Donna Clary were at their home on the evening of April 15, 2004 and testified that they saw an unmarked police car stop a car outside their window, heard at least two gunshots, saw an officer "down," and observed a young black woman standing near the car, speaking on a cell phone and crying. Michael Clary heard the woman say, " 'I didn't think he would do it,' " and Donna Clary heard her say something like, " 'I can't believe that he shot him.' "

Officer Greene testified that at approximately 7:15 p.m., he heard Officer Gray say over the radio that he was making a traffic stop involving Rivera. When Officer Gray did not respond to status update requests, and after gunshots were reported in the area, Officer Greene was dispatched to Officer Gray's location. Officer Greene found Officer Gray lying facedown on the sidewalk with a large gash on his forehead and a pool of blood under his head and upper torso. He was breathing and had a shallow pulse, but he did not speak. Upon removing his clothing to find other injuries, Officer Greene and Officer Smith, who arrived on the scene shortly thereafter, discovered a bullet hole in his right chest.

An autopsy revealed that Officer Gray sustained two gunshot wounds: a nonfatal wound consistent with a bullet entering the back of his left arm approximately nine inches from the top of his shoulder and traveling 5.5 inches in muscle and soft tissue before exiting his arm; and a fatal wound consistent with a bullet entering the right side of his chest, traveling through a large artery and his lung, and striking his spinal column, thereby severing the spinal cord. The bullet that caused the first wound was never found, but the .45-caliber bullet responsible for the second wound was recovered from Officer Gray's body, along with two expended shell casings recovered from the scene of the shooting. Forensic evidence revealed that the bullet and shell casings came from the same .45-caliber semiautomic pistol as the bullet and three expended shell casings recovered from the April 11, 2004 shooting. The gun used to shoot Officer Gray was not recovered.

Sergeant Thomas Trinidad, Officer Gray's supervisor in the gang unit, testified that Officer Gray had been leading an investigation into the Merced Gangster Crips's drug trade, that

the gang's business boomed once Officer Gray was killed, and that the investigation had to start all over again because "no one [else] had the knowledge of the entire gang or their associates." Sergeant Trinidad also testified that killing a police officer could "immensely" enhance a criminal street gang's reputation, and that the Merced Gangster Crips encouraged the killing of police officers. He testified that Officer Gray's death benefited and energized the gang, and described a gang member's statement in a recorded phone conversation after the killing that "somebody had to . . . smoke his ass," referring to Officer Gray.

### e. After the Shooting

Daniel Flores did not know Rivera personally but had seen him around the neighborhood. He testified that on the night of April 15, 2004, Rivera walked into Flores's house, which was three blocks from Glen Avenue. Rivera told Flores to stay put and give him some clothes. Flores was not sure what was happening but was scared and felt that there might be a problem if he did not follow instructions. Flores gave Rivera a pair of sweatpants, which Rivera put on over the clothes he was already wearing. Flores's roommate, Ricardo Munoz, arrived about five minutes later. Munoz did not know Rivera either, but when Rivera asked for clothes, Munoz removed the T-shirt he was wearing and gave it to him, hoping Rivera would leave the house. Rivera asked for a ride, but Munoz refused because he believed Rivera had done something wrong. Munoz suspected Rivera was hiding from the police because Rivera asked him "where the cops were at." When Rivera again asked for a ride, Munoz refused once again, this time because there was a police car blocking his vehicle. Neither Flores nor Munoz saw a weapon on him.

LaDonna Davis-Turner and her roommate, Dabreka Thompson, testified that a few days after the shooting, people familiar with Rivera pressured Davis-Turner and Thompson to pick Rivera up and drive him to San Diego. They gave Davis-Turner money to do so. Davis-Turner and Thompson eventually agreed, drove Rivera to San Diego, and allowed him to stay at Davis-Turner's apartment for a few days. During this time, Davis-Turner heard Rivera speak negatively about Officer Gray; at one point, she heard Rivera say, "I hate Officer Gray. I hate Officer Gray. Fuck Officer Gray." After several days, Davis-Turner and Thompson decided to contact the police. At some point, Davis-Turner, Thompson, and Rivera traveled to Merced, and the police instructed Davis-Turner and Thompson to meet up with Rivera under the pretense that they would drive him back to San Diego. Officers stopped the car and arrested Rivera.

### 2. Defense Evidence

Defense counsel conceded during closing argument that Rivera shot and killed Officer Gray but argued that none of the evidence presented by the prosecution demonstrated beyond a reasonable doubt that the shooting was premeditated or gang-related. Rather, the shooting was a "chance encounter." Defense counsel presented testimony from Professor Jose Lopez, a gang expert, who concluded that the shooting "was not a gang-related crime" because the events unfolded rapidly, leaving little time for Rivera to deliberate on whether killing Officer Gray would increase his gang's reputation. Furthermore, killing a police officer would not boost the reputation of his gang, but instead would put both the killer and the gang in trouble by inviting a crackdown from police. Accordingly, Professor Lopez believed that Rivera was "just trying to escape."

Defense counsel also argued that Rivera was not involved in the McIntire/Bianchi shooting, emphasizing that neither Bianchi nor McIntire could identify Rivera in lineups and were only now certain after having multiple conversations with law enforcement officers and seeing news stories focused on Rivera.

The jury received its instructions, heard closing arguments, and began its deliberations on May 2, 2007. The following day, the jury found Rivera guilty of the first degree murder of Officer Gray and found true the special circumstance allegations that the murder was committed for the purpose of avoiding or preventing a lawful arrest or perfecting or attempting to perfect an escape from lawful custody, and that the murder involved the intentional killing of a peace officer who was engaged in the performance of his duties. The jury found not true the special circumstance allegation that the murder was carried out to further the activities of a criminal street gang. The jury also convicted Rivera of two counts of unlawful possession of a firearm by a felon, two counts of shooting at an occupied vehicle, and two stayed counts of assault with a semiautomatic firearm. The jury found true all enhancements, including that the offenses of murder and unlawful possession of a firearm were "committed for the benefit of, at the direction of, or in association with any criminal street gang" for the purposes of Penal Code section 186.22, subdivision (b)(1)'s gang enhancement.

## B. Penalty Phase

The penalty phase of trial began on May 9, 2007.

### 1. Prosecution Evidence

Rivera was previously convicted for unlawful possession of a firearm (Pen. Code, § 12021, subd. (e)) and possession for sale

of cocaine base (Health & Saf. Code, § 11351.5). He had been adjudicated a ward of the juvenile court for two felony offenses: making criminal threats and brandishing a deadly weapon on one occasion and threatening school officials on another.

The prosecution referred the jury to its verdicts finding Rivera guilty of firing three shots at McIntire and Bianchi, and of murdering Officer Gray while he was performing his duties. The court instructed the jury that it could consider certain evidence if the jury found the allegations true beyond a reasonable doubt. Specifically, the court cited evidence from the guilt phase that Rivera previously had been convicted of possession of a firearm by a prohibited person and possession for sale of cocaine base, and uncharged conduct including two counts of shooting at an occupied vehicle, two counts of assault with a semiautomatic firearm, possession of a firearm by a felon, making criminal threats in violation of Penal Code section 422, threatening school employees in violation of Penal Code section 71, assault with a firearm upon Marlon Bradley in violation of Penal Code section 248, and dissuading a witness and brandishing a firearm upon Larry Gonzalez and Adel Mohammed in violation of Penal Code sections 136.1 and 417.

Sergeant Barbara Carbonaro testified that on April 18, 2006, Rivera caused a disturbance at the jail by bailing water out of the toilet, resulting in flooding in his cell and the hallway. According to Sergeant Carbonaro, Rivera was angry because he could not be rehoused in the jail's general population. She recalled that Rivera said his treatment was "unfair" and that he was in jail "just because some pig got killed." Sergeant Carbonaro understood Rivera to be referring to Officer Gray.

The prosecution presented testimony from Mark Dossetti, retired chief of police for the City of Merced, that Officer Gray's killing was the first of any Merced police officer while on duty. Chief Dossetti testified that Officer Gray was "loved and respected by everybody," and that his death emotionally devastated the police department. Chief Dossetti and Sergeant Christopher Goodwin said that Gray was a motivated, professional officer and a good friend. Tony Gray, Officer Gray's brother, testified that they had been close and that his death had caused Tony to attempt suicide twice and to take medication for depression. Landess Gray, Officer Gray's daughter who was 13 at the time of his death, testified that she thinks about him all the time and has sought psychiatric counseling for the anger, unhappiness, and confusion caused by her father's death. Lonather Gray, Officer Gray's mother, testified that he was a good child and that her life has been "horrible" since his death. Michelle Gray, Officer Gray's widow, testified that he was a good husband and "the very best" father. The two were planning a 10-year wedding anniversary trip when he died.

### 2. Defense Evidence

Dr. Avak Howsepian, a medical doctor who interviewed Rivera and spoke with his family and relatives, testified that Rivera suffered from posttraumatic stress disorder, impulse control disorder not otherwise specified, and psychotic disorder. Dr. Howsepian attributed Rivera's posttraumatic stress disorder to his witnessing, at age three or four, an accident in which a motorcyclist was killed. He opined that this trauma was exacerbated by Rivera's fatherless childhood and his mother's relationship with a man who beat her, causing Rivera to stay home from school to protect her. Rivera also had to protect his mother from his brother, Oswaldo, who suffered from mental

14

health problems and physically attacked their mother on one occasion. Dr. Howsepian testified that at the time of the shooting Rivera suffered from a psychotic disorder that caused his perceptions to become detached from reality and caused Rivera to be deeply paranoid of Officer Gray.

A number of witnesses testified to Rivera's good character. Esperanza Yadira Rivera, Rivera's niece, testified that Rivera was a father figure to her who talked with her about school, grades, and boys. Rivera continues to be a positive influence on her by writing letters from jail and encouraging her to get good grades and to stay out of trouble. Marcela Arroyo, Rivera's younger sister, testified that Rivera had a positive impact on her while they were growing up and that he continues to encourage her to stay in school and to be a role model to the younger members of the family. Marcela Arroyo also testified that after her grandfather was in a car accident, Rivera saved his life by pulling him out of the car. Erika Rivera, Rivera's mother, testified that money was tight while the children were growing up. Rivera's father left when she was two months pregnant with Rivera. After he had a child of his own, Rivera looked for his own father but never found him. Erika Rivera also testified that her son tried to be a father figure to his siblings and was "very focused on his daughter," with whom he remains in touch.

## II. ISSUES REGARDING GUILT AND SPECIAL CIRCUMSTANCES

### A. Sufficiency of the Evidence for First Degree Murder

Rivera contends that there was insufficient evidence to support a conviction for first degree murder committed with premeditation and deliberation. Upon a challenge to the

sufficiency of evidence for a jury finding, we " ' " 'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence — that is, evidence which is reasonable, credible, and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) "The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11; see *People v. Stanley* (1995) 10 Cal.4th 764, 792–793.)

In *People v. Anderson* (1968) 70 Cal.2d 15, we observed that "[t]he type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls into three basic categories": (1) facts about planning activity "prior to the actual killing which show[s] that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing"; (2) "facts about the defendant's prior relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim"; and (3) "facts about the nature of the killing from which the jury could infer that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design.' " (*Id.* at pp. 26–27, italics omitted.) "Since *Anderson*, we have emphasized that its guidelines are descriptive and neither normative nor exhaustive, and that reviewing courts need not accord them any particular weight." (*People v. Halvorsen* (2007) 42 Cal.4th 379, 420.)

Rivera argues there was insufficient evidence of each of the *Anderson* factors for the jury to convict him of first degree murder; rather, the killing resulted from an unplanned encounter initiated by Officer Gray's stop. The Attorney

General counters that there was at least some evidence of all three factors and that although Rivera did not initiate the encounter, he premeditated and deliberated on the killing once he realized that Officer Gray was following his vehicle. We conclude there was sufficient evidence to sustain the conviction.

The prosecutor presented evidence that Rivera and Officer Gray "knew each other on sight" and that Rivera had an ongoing relationship from which the jury could reasonably infer a motive to kill. Officer Gray lectured Rivera about hanging around "with the people he was hanging around with" and warned Rivera that if Officer Gray "[saw] him doing anything, then, you know, he would come get him." Peterson testified that on the night of the shooting, she stopped at a four-way stop sign, where both she and Rivera recognized Officer Gray stopping around the same time. Officer Gray turned his car around and followed Rivera and Peterson south. After noticing they were being followed, Rivera said, "Mother-fucker, why did — Why is he always bothering me? Why is he harassing me? Why don't he just leave me alone?" Rivera then called Peterson's father, Anton Martin, and told him that Officer Gray was following him. Rivera made a second phone call to Clint Ward, a popular contact among gang members because he had a car and would offer them rides. Peterson did not find it unusual for Rivera to call these two individuals, but she could not explain why he would need a ride. Peterson also recalled Rivera's stepbrother, Salvador Arroyo, telling her that Arroyo remembered hearing Rivera say he was "going to do something to Gray because he was tired of [Gray] harassing him," but Arroyo testified that he did not remember this conversation.

Based on this evidence, the jury could have reasonably concluded that Rivera made the phone calls and held onto his

gun when he exited the vehicle because he was planning to kill Officer Gray. Furthermore, Rivera and Officer Gray's history of past contentious encounters as well as Rivera's comments to Peterson in the car provided evidence of a prior relationship and conduct from which the jury could have inferred a motive to kill Officer Gray. (See *People v. Cruz* (1980) 26 Cal.3d 233, 245 ["Defendant's pent-up resentment toward his victim[] establishes the prior relationship from which the jury reasonably could infer a motive for the killing[]."].) Taken together, the evidence is sufficient to support the jury's finding that Rivera committed a premeditated and deliberate murder.

## B. Use of CALJIC No. 8.71

Rivera contends that the trial court gave a flawed version of CALJIC No. 8.71 that suggested a juror was to give the defendant the benefit of the doubt as to the degree of the offense only if all jurors unanimously had a reasonable doubt as to the degree. Rivera argues that the alleged instructional error deprived him of the benefit of the judgment of individual jurors and diminished the prosecutor's burden of proof, thereby violating his rights under state law and under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

The trial court gave the following instruction to the jury: "If you are convinced beyond a reasonable doubt and unanimously agree that the crime of murder has been committed by the defendant, but you unanimously agree that you have a reasonable doubt whether the murder was of the first or of the second degree, you must give the defendant the benefit of that doubt and return a verdict fixing the murder as of the second degree." The instruction tracks the version of CALJIC No. 8.71 as of 2007, when the trial occurred. In 2011, we

"conclude[d] the better practice is not to use [this version of CALJIC No. 8.71], as the instruction[] carr[ies] at least some potential for confusing jurors about the role of their individual judgments in deciding between first and second degree murder . . . ." (*People v. Moore* (2011) 51 Cal.4th 386, 411 (*Moore*).) Following our decision in *Moore*, CALJIC No. 8.71 was amended to read: "If any juror is convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but has a reasonable doubt whether the murder was of the first or of the second degree, that juror must give defendant the benefit of that doubt and find that the murder is of the second degree."

We review a claim of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) The challenged instruction is considered "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229 (*Houston*).)

We conclude that the use of CALJIC No. 8.71 was "not erroneous . . . when considered with the rest of the charge to the jury." (*People v. Salazar* (2016) 63 Cal.4th 214, 248 (*Salazar*).) Here, the trial court also instructed the jury with CALJIC No. 8.74: "Before you may return a verdict in this case, you must agree unanimously not only as to whether the defendant is guilty or not guilty, but also, if you should find him guilty of an unlawful killing, you must agree unanimously as to whether he is guilty of murder of the first degree or murder of the second degree." CALJIC No. 8.74 explains that there must be unanimous agreement for the jury to convict on first degree

murder and clarifies that a jury could not convict Rivera of the greater charge if there is no such agreement.

Furthermore, the trial court instructed the jury with CALJIC No. 17.40: "The People and the defendant are entitled to the individual opinion of each juror. Each of you must consider the evidence for the purpose of reaching a verdict if you can do so. Each of you must decide the case for yourself but should do so only after discussing the evidence and instructions with the other jurors. [¶] Do not hesitate to change an opinion if you are convinced it is wrong. However, do not decide any question in a particular way because a majority of the jurors or any of them favor that decision. Do not decide any issue in this case by the flip of a coin or by any other chance determination." Such an instruction emphasizes that jurors must each decide guilt for themselves and mitigates the concern that jurors would abandon their individual judgments regarding reasonable doubt to first degree murder because of the instruction using former CALJIC No. 8.71. (See *People v. Gunder* (2007) 151 Cal.App.4th 412, 424–425 [finding no reversible error where, in addition to CALJIC No. 8.71, the trial court gave an instruction nearly identical to CALJIC No. 17.40]; *People v. Pescador* (2004) 119 Cal.App.4th 252, 255–258 [finding no reversible error where the trial court instructed with CALJIC Nos. 17.11 (stating that if the jury found the defendant guilty, but reasonable doubt existed as to whether the murder was of the first or second degree, the jury must find the defendant guilty of murder in the second degree), 17.40, and 8.50 (describing the difference between murder and manslaughter) in addition to CALJIC No. 8.71].) These two instructions mitigated any possible confusion from the use of CALJIC No. 8.71. (See *People v. Buenrostro*

(2018) 6 Cal.5th 367, 428–430; *People v. Gomez* (2018) 6 Cal.5th 243, 302.)

There is also no indication in the record that the jury was confused by the instruction. The jury submitted one note to the judge requesting copies of several Penal Code sections or an interpretation from the court about the statutory language of one of the special circumstances and one of the enhancements alleged. The trial court directed the jury to its earlier instructions and indicated that if the jury needed further explanation, the court could address that later. The jury did not inquire further.

Based on the collective instructions given regarding the requirement of unanimity and individual decisionmaking, and given the lack of any indication that the jury was confused or misled into returning the greater verdict of first degree murder despite a juror having a reasonable doubt of such a finding, we conclude that "[n]o logical reading" of CALJIC No. 8.71 would compel a first degree murder verdict under the circumstances present here. (*Salazar*, *supra*, 63 Cal.4th at p. 247.)

## C. Acquittal-first Instruction on First Degree Murder

Rivera contends that the CALJIC No. 8.71 also violated his rights under state law and under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution because it was an acquittal-first instruction that required the jury to find appellant not guilty of first degree murder before it could return a verdict on second degree murder. Rivera concedes that we have held that "when the jury returns a verdict on [a] lesser included offense, it must also render a corresponding verdict of acquittal on the greater offense." (*People v. Fields* (1996) 13 Cal.4th 289, 310.) But he argues that we should reconsider this holding because it precludes full jury consideration of lesser included offenses in violation of his constitutional rights.

"Under the acquittal-first rule, a trial court may direct the order in which jury verdicts are returned by requiring an express acquittal on the charged crime before a verdict may be returned on a lesser included offense." (*People v. Bacon* (2010) 50 Cal.4th 1082, 1110.) We have observed that an acquittal-first instruction must not prohibit the jury from considering or deliberating on the lesser included offense before returning a verdict on the greater offense. (*People v. Kurtzman* (1988) 46 Cal.3d 322, 330–331.)

The instruction with which Rivera takes issue here (CALJIC No. 8.71) does not directly address the order-of-deliberations issue and therefore does not provide occasion to reconsider our prior holdings. CALJIC No. 8.71 simply states that if the jury has reasonable doubt about whether the murder was of the first or second degree, the jury "must give defendant the benefit of that doubt and find that the murder is of the

second degree." Unlike other instructions that the trial court did not employ in this case, CALJIC No. 8.71 does not instruct the jury that it must acquit a defendant of a greater offense before being able to find the defendant guilty of a lesser included offense. (Compare CALJIC No. 8.75 ["The court cannot accept a verdict of second degree murder unless the jury also unanimously finds and returns a signed verdict form of not guilty as to murder of the first degree."].) If anything, the use of CALJIC No. 8.71 *reduced* the likelihood that the jury failed to consider the lesser included offense because the instruction expressly reminded the jury it may convict the defendant of second degree murder in lieu of first degree murder and emphasized that any doubt should be resolved in the defendant's favor. CALJIC No. 8.71 therefore does not implicate the acquittal-first rule nor pose any of the potential constitutional concerns raised by such a rule.

## D. Failure To Instruct That Subjective Provocation May Reduce Premeditated First Degree Murder to Second Degree Murder

Rivera contends that the trial court committed prejudicial error when it failed to sua sponte instruct the jury that subjective provocation can reduce premeditated murder to second degree murder in this case because the evidence of premeditation and deliberation was weak, and because substantial evidence tended to show the shooting was in direct response to appellant's perception that the traffic stop and search were part of a pattern of harassment.

Provocation may indeed reduce murder from first to second degree. (*People v. Thomas* (1945) 25 Cal.2d 880, 903 [provocation might "be adequate to negative or raise a

reasonable doubt as to the idea of premeditation or deliberation, leaving the homicide as murder of the second degree"].) But an instruction that provocation may be sufficient to raise reasonable doubt about premeditation or deliberation, such as CALJIC No. 8.73 or CALCRIM No. 522, is a pinpoint instruction to which a defendant is entitled only upon request where evidence supports the theory. (*People v. Rogers* (2006) 39 Cal.4th 826, 877–880.) The trial court is not required to give such an instruction sua sponte. (*Id.* at pp. 878–879 ["Because CALJIC No. 8.73 relates the evidence of provocation to the specific legal issue of premeditation and deliberation, it is a 'pinpoint instruction' . . . and need not be given on the court's own motion."].) In this case, Rivera did not make a request for an instruction on provocation. The trial court did not err by failing to so instruct the jury.

### E. Instruction on Special Circumstance Allegation of Murder To Prevent Arrest or Escape from Lawful Custody

Rivera contends the trial court erred by instructing the jury that the special circumstance under Penal Code section 190.2, subdivision (a)(5) could be found true upon a finding that either (1) the murder was committed to avoid or prevent a lawful arrest, or (2) the murder was committed to perfect or attempt to perfect an escape from lawful custody. Rivera asserts that the second theory is invalid because at the time of the murder, he was neither under arrest nor charged with an offense, nor was he in jail or prison. Rivera contends that the failure to adequately instruct the jury upon matters relating to proof of any element of the charge violates his Fifth, Sixth, and Fourteenth Amendment rights under the federal Constitution,

as well as his rights to trial by jury and due process under article I, sections 15 and 16 of the California Constitution.

As noted, we review a claim of instructional error de novo. (*People v. Cole, supra*, 33 Cal.4th at p. 1210.) We consider the challenged instruction in the context of the instructions and record as a whole to ascertain whether there is a reasonable likelihood the jury impermissibly applied the instruction. (*Houston, supra*, 54 Cal.4th at p. 1229.)

"The nature of th[e] harmless error analysis depends on whether a jury has been presented with a legally invalid or a factually invalid theory." (*People v. Perez* (2005) 35 Cal.4th 1219, 1233 (*Perez*).) A legally inadequate theory involves a "mistake about the law" that the jury would generally have no reason to know, such as if " 'the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime.' " (*People v. Guiton* (1993) 4 Cal.4th 1116, 1125.) A factually inadequate theory involves a mistake about a fact that the "jury is fully equipped to detect" (*id.* at p. 1129) or a theory that "while legally correct, has no application to the facts of the case" (*Perez*, at p. 1233). In cases of factual inadequacy, the error is one of state law, and "[w]e will affirm 'unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the unsupported theory.' " (*Id.* at p. 1233, quoting *Guiton*, at p. 1130.)

The special circumstance in Penal Code section 190.2, subdivision (a)(5) provides: "The murder was committed for the purpose of avoiding or preventing a lawful arrest, or perfecting or attempting to perfect, an escape from lawful custody." The trial court accordingly instructed the jury with CALJIC No.

8.81.5: "To find that the special circumstance referred to in these instructions as murder to prevent arrest or to perfect an escape is true, the following facts must be proved: [¶] First, the murder was committed for the purpose of avoiding or preventing a lawful arrest; or second, the murder was committed to perfect or attempt to perfect an escape from lawful custody. . . ." There is no mistake of law in the instruction; CALJIC No. 8.81.5 tracks the language of the Penal Code. But, as the Attorney General concedes, Rivera was not in custody at the time of the murder and could not have been perfecting or attempting to perfect an escape from lawful custody. We accept the Attorney General's concession that the alternate theory of murder for the purpose of perfecting or attempting to perfect an escape from lawful custody was a factually inadequate theory. We therefore must assess whether it was reasonably probable that the jury found Rivera guilty solely on the unsupported theory. (*Perez, supra*, 35 Cal.4th at p. 1233.)

The record as a whole does not suggest that the jury relied on the unsupported theory. It is undisputed that Officer Gray stopped the car and asked Rivera, who was on parole, to exit the car. It is also undisputed that at that point, Rivera ran away while possessing a gun that he later used during the pursuit. During closing argument, the prosecutor argued that the jury should find the special circumstance true because "the defendant killed Officer Gray who was about to make a lawful arrest." The jury found that Rivera intentionally killed Officer Gray while he was engaged in the performance of his duties or in retaliation for the performance of his duties. The jury also found Rivera guilty of being a felon in possession of a firearm while running away from Officer Gray. The underlying facts and convictions indicate there was ample evidence that the jury

relied on the first theory — that the murder was committed for the purpose of avoiding or preventing a lawful arrest — to find true the special circumstance in rendering its verdict. It was thus not reasonably probable, based on the record as a whole, that the jury found Rivera guilty on the unsupported theory of escaping from custody. We therefore affirm the jury's special circumstance finding.

### F. Peace-officer-killing Special Finding Does Not Apply to First Degree Murder

Rivera initially contended that the peace-officer-killing enhancement must be stricken because Penal Code section 190, subdivision (c) provides that the enhancement only applies to second degree murder. The Attorney General concedes that this enhancement only applies to second degree murder but argues that we need not take action because the trial court already set aside the special finding. In response, Rivera agrees and withdraws the argument as moot. Our review of this claim is therefore unnecessary.

### G. Sufficiency of the Evidence for Gang-related Enhancements for First Degree Murder and Felon-in-possession-of-a-firearm Convictions

Rivera argues that the evidence is insufficient to sustain the jury's true finding that his convictions for murder and unlawful possession of a firearm by a felon were committed for the benefit of, at the direction of, or in association with a criminal street gang for the purpose of a gang-related enhancement. (Pen. Code, § 186.22, subd. (b)(1).)

"We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction." (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) "We presume

every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Abillar*).) The standard is the same whether the prosecution relies on direct or circumstantial evidence. (*People v. Valencia* (2008) 43 Cal.4th 268, 290 (*Valencia*).)

Penal Code section 186.22, subdivision (b)(1)'s gang enhancement applies to "any person" convicted of a number of enumerated felonies, including murder and unlawful possession of a firearm by a felon, that were (1) " 'committed for the benefit of, at the direction of, or in association with any criminal street gang,' " and (2) " 'with the specific intent to promote, further, or assist in any criminal conduct by gang members.' " (See *People v. Livingston* (2012) 53 Cal.4th 1145, 1170–1171 [considering sufficiency of evidence for each prong of Pen. Code § 186.22, subd. (b)(1)].) "Not every crime committed by gang members is related to a gang" for purposes of the enhancement (*Albillar*, *supra*, 51 Cal.4th at p. 60), but the enhancement applies "when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang" (*id.* at p. 68).

In this case, the prosecution presented evidence that Rivera was an active member of the Merced Gangster Crips: He participated in and had previously pled guilty to offenses related to the gang's drug trade; he bore gang tattoos that referred to the Merced Gangster Crips; and he possessed firearms associated with the gang. Rivera contacted several individuals who were either members of the gang or "hung around" with

known members before and after the murder, presumably to facilitate his escape. (See *People v. Abilez* (2007) 41 Cal.4th 472, 508 [subsequent conduct may constitute circumstantial evidence of intent at the time of the offense].)

The prosecution also presented evidence that Officer Gray had been leading an investigation into the Merced Gangster Crips's drug trade, and that Rivera had personally interacted with Officer Gray in the course of his investigation of a shooting involving another gang member: During a parole check, Officer Gray and another officer asked Rivera about the other gang member and searched his home for any information about the whereabouts of the other gang member. Officer Gray also lectured Rivera about hanging around "with the people he was hanging around with." Finally, although the gun used to kill Officer Gray was not recovered, forensic evidence of the bullet recovered from Officer Gray's body and shell casings found at the scene indicated that they came from the same .45-caliber semiautomatic firearm used in the gang-related McIntire shooting three days earlier. A reasonable jury could infer from this evidence that Rivera specifically intended the murder to benefit and promote the gang.

## H. Failure To Instruct Jury on All Elements of Assault for Purposes of Offense of Assault with a Semiautomatic Firearm

Rivera contends that the failure to instruct on the elements of "assault" created a structural error requiring per se reversal of the convictions of assault with a semiautomatic firearm against McIntire and Bianchi in counts V and VI. The trial court instructed the jury in the language of CALJIC No. 9.02.1: "Defendant is accused in Counts V and VI of having

violated Section 245 subdivision (b) of the Penal Code, a crime. Every person who commits an assault upon the person of another with a semiautomatic firearm is guilty of a violation of Penal Code Section 245[,] subdivision (b), a crime. [¶] In order to prove this crime, each of the following elements must be proved: [¶] First, a person was assaulted; [¶] Second, the assault was committed with a semiautomatic firearm." But the trial court did not offer CALJIC No. 9.00 or a similar instruction defining assault. The Attorney General concedes that the trial court erred by not defining assault but argues that the error was not structural and does not require reversal. We conclude the error was harmless beyond a reasonable doubt.

"The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense." (*People v. Merritt* (2017) 2 Cal.5th 819, 824.) Failure to do so is a "very serious constitutional error because it threatens the right to a jury trial that both the United States and California Constitutions guarantee. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16.) All criminal defendants have the right to 'a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " (*Ibid*.) The error is reversible unless "it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*Id*. at p. 831.)

Here, the jury found, upon proper instruction, that Rivera personally used a firearm in violation of Penal Code section 12022.5, subdivision (a)(1), which required a finding that Rivera "intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it" as to each victim. That finding alone may be sufficient to establish assault. (*People v. McMakin* (1857) 8 Cal.

547, 548 [observing that "presenting" a gun at person within its range can constitute assault]; *People v. Laya* (1954) 123 Cal.App.2d 7, 16 ["The mere pointing of a gun at a victim constitutes an assault with a deadly weapon, whether or not it is fired at all."].) But in this case, the jury also found, upon proper instruction, that Rivera was guilty of shooting at an occupied vehicle in violation of Penal Code section 246, which requires "[a] person discharged a firearm at an occupied vehicle" and "the discharge of the firearm was willful and malicious." These offenses encompass the elements of assault. Because the trial court provided other instructions and the jury's findings necessarily addressed the elements of assault, we conclude the trial court's failure to give the instruction was harmless.

## I. Allegations of Prosecutorial Misconduct During Guilt-phase Closing Argument

Rivera contends that the prosecutor committed four instances of misconduct during his closing argument: (1) suggesting unethical conduct by the defense expert witness; (2) arguing the existence of facts not admitted into evidence to bolster the prosecution's case; (3) vouching for witnesses, thereby bolstering the testimony in support of the prosecution's case; and (4) appealing to passion and fear and, in doing so, misstating the law on first degree premeditated murder. These instances, Rivera argues, rendered the trial fundamentally unfair and denied him his state and federal rights to due process, effective assistance of counsel, and a fair trial.

" 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the

resulting conviction a denial of due process.' " ' " (*People v. Friend* (2009) 47 Cal.4th 1, 29 (*Friend*), quoting *Darden v. Wainwright* (1986) 477 U.S. 168, 181.)  " 'Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' " (*Friend*, at p. 29, quoting *People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.)  "When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*Id.* at p. 29, quoting *People v. Smithey* (1999) 20 Cal.4th 936, 960.)  Prosecutorial misconduct can result in reversal under state law if there was a "reasonable likelihood of a more favorable verdict in the absence of the challenged conduct" and under federal law if the misconduct was not "harmless beyond a reasonable doubt." (*People v. Cook* (2006) 39 Cal.4th 566, 608 (*Cook*).)  Where the defendant does not contemporaneously object to alleged misconduct, we generally decline to review the claim on appeal unless a timely admonition could not have cured the harm. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1251 (*Pensinger*); *Friend*, at p. 29 [" 'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' "].)

Rivera objected only to the first three instances of alleged misconduct, and he only did so outside the presence of the jury after the closing argument was over.  His claims are therefore untimely and forfeited. (*Pensinger, supra,* 52 Cal.3d at p. 1251; *Friend, supra,* 47 Cal.4th at p. 29.)  But in any event, each

instance of alleged misconduct either did not constitute misconduct or was harmless.

### *1. Suggesting Unethical Conduct by the Defense Expert Witness*

Rivera argues the prosecutor improperly suggested that defense expert Professor Lopez engaged in unethical conduct when the prosecutor said to the jury: "We would suggest that based on the flawed manner in which the defense expert . . . conducted his research, you can completely disregard the testimony that this murder was not committed for the benefit of the street gang. Didn't talk to any other than one member of [the Merced Gangster Crips], spent two hours with the defendant, didn't talk to Sergeant Trinidad, didn't talk to any Merced police officers, get the lay of the land. That's not research. That's not an investigation. That's taking money and trying to arrive at a conclusion that the money was paid to secure."

"Argument may not denigrate the integrity of opposing *counsel*, but harsh and colorful attacks on the credibility of opposing *witnesses* are permissible. [Citations.] Thus, counsel is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent 'lie.' " (*People v. Arias* (1996) 13 Cal.4th 92, 162.) We have previously concluded that discrediting a defense witness does not constitute misconduct provided that the "prosecutor's argument merely focused on the evidentiary reasons why [an expert's opinions] could not be trusted." (*Ibid.*; see also *People v. Blacksher* (2011) 52 Cal.4th 769, 838 [concluding prosecutor's claim that a defense witness was not useful to defendant's case

"was permissible comment on the evidence"].) Here, the prosecutor's remarks insinuated that the witness was paid and might be biased. The prosecutor also suggested that the defense witness was incredible, relying on his cross-examination of the witness that tended to suggest the witness's research methodology was lacking. Neither this approach nor the prosecutor's statement in closing argument constituted misconduct.

### 2. *Arguing the Existence of Facts Not Admitted into Evidence*

In his closing argument, the prosecutor said to the jurors: "Members of the Jury, this case has gone faster than we anticipated because frankly, and sadly, the facts just aren't very complex. Many of the witnesses we could have called would have been repetitive, and Mr. Bacciarini and I are completely satisfied that you understand what happened in both shootings. There isn't much more to add." Rivera argues that the prosecutor committed misconduct by referring to facts not admitted into evidence. " '[S]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct.' " (*People v. Bolton* (1979) 23 Cal.3d 208, 212.) The Attorney General concedes that the prosecutor's statement that he could have called other witnesses was improper but argues that the error was harmless. We agree.

Whether considered under this state's "reasonable likelihood of a more favorable verdict" standard or the federal "harmless beyond a reasonable doubt" standard, the error here was harmless. (*Cook*, *supra*, 39 Cal.4th at p. 608.) It is true that the prosecutor was apparently attempting to bolster the credibility of the admitted evidence by suggesting other

evidence existed to corroborate it. But the prosecutor's statement was an isolated instance in a closing statement that otherwise focused on admitted evidence, which was quite strong in favor of Rivera's guilt. Furthermore, the jury was instructed to determine the facts "from the evidence received in this trial and not from any other source" and that "[s]tatements made by the attorneys during the trial are not evidence." For these reasons, we conclude the error was harmless.

### 3. Vouching for Witnesses

Rivera also argues that that by referring to unadmitted evidence and stating that he was "completely satisfied that you [the jury] understand what happened in both shootings," the prosecutor committed misconduct by vouching for the witnesses. "While a 'prosecuting attorney has a wide range in which to state his views as to what the evidence shows and the conclusions to be drawn therefrom' [citation], and in his argument to the jury the prosecutor may comment upon the credibility of witnesses 'in the light of all the evidence in the case' [citations], '[i]t is misconduct for a prosecuting attorney to express his personal belief as to the reliability of a witness.' " (*People v. Perez* (1962) 58 Cal.2d 229, 245.) "Impermissible 'vouching' may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony." (*People v. Fierro* (1991) 1 Cal.4th 173, 211.) "Such an expression of personal opinion is misconduct whether the prosecutor is seeking thereby to bolster testimony which was in support of the People's case [citations], or whether the People's representative is attempting to discredit the credibility or reliability of

witnesses testifying in support of the defendant." (*Perez*, 58 Cal.2d at p. 246.)

The prosecutor did not refer to any particular witness nor make assurances of the truth of their testimony. His brief allusion to facts not in evidence did not have the prejudicial effect of bolstering the testimony of any particular witness. The prosecutor's statement therefore did not constitute impermissible vouching of a witness.

### 4. *Appealing to Passion and Fear and Misstating the Law on First Degree Premeditated Murder*

Rivera argues that the prosecutor improperly appealed to passion and fear by making several statements during closing argument. First, the prosecutor said to the jury: "On the homefront, one of the most important acts of citizenship that any person can be asked to perform is now being performed by you in your service as jurors; and more so, in a murder trial in which the penalty being sought is death." In rebuttal, the prosecutor urged the jury to "bring a verdict into this courtroom that honors its more than 150-year tradition of justice." Second, the prosecutor argued: "[G]angsters don't deserve second-degree murder because they already come from a murder mindset. Murder is already part of their culture. It was already part of the defendant's lifestyle, part of who he is." On rebuttal, the prosecutor also said: "Gang members are ready to kill. It's part of their culture; it's what they do. They commit acts of violence." Finally, the prosecutor repeated the initial statement: "Gang members, like this prosecutor said, don't get second-degree murder, they don't deserve second-degree murder." Rivera argues these statements both appealed to the jurors' passions by bringing the potential death penalty to bear

during the guilt phase and by encouraging the jury to allow a fear of gangs to influence their evaluation of the case. He also contends the prosecutor's comments misstated the law regarding premeditated first degree murder.

"A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury." (*Pensinger, supra,* 52 Cal.3d at p. 1251.) "[I]t is improper for a prosecutor to appeal to the passion or prejudice of the jury." (*People v. Cornwell* (2005) 37 Cal.4th 50, 92 (*Cornwell*).) "[I]t is misconduct for a prosecutor, during argument, to misstate the law [citation], or to invite or encourage the jury to do what the law prohibits." (*People v. Whalen* (2013) 56 Cal.4th 1, 77.)

Even assuming Rivera did not forfeit his claim concerning the statements about jury service by failing to timely object, we conclude that these statements do not constitute misconduct. The prosecutor's statement merely reminded the jurors about the importance of the civic duty in which they were engaged. It did not ask the jury to act on the basis of fear or to decide the case in a particular way in light of that duty. (See *Cornwell, supra,* 37 Cal.4th at pp. 92–93 [finding no prosecutorial misconduct for prosecutor's appeal to " 'the duty' " that is " 'essential to our society' " where "the prosecutor's argument did not urge the members of the jury to act on the basis of their fear of chaos and crime in the community, but to act with an understanding of the importance of law in the abstract"].)

The prosecutor's statements that gang members do not "deserve second-degree murder" and "don't get second-degree murder" are more troubling. Being affiliated with a gang does

not make a defendant deserving of conviction for first degree murder. The mental state required for first degree murder "is uniquely subjective and personal. It requires more than a showing of intent to kill; the killer must act deliberately, carefully weighing the considerations for and against a choice to kill before he or she completes the acts that caused the death." (*People v. Chiu* (2014) 59 Cal.4th 155, 166.) To suggest that a gang member deserves to be convicted of first degree murder or may be convicted of only first degree murder rather than second degree murder is a misstatement of the law.

But Rivera did not object to the prosecutor's statements implying that gang members deserve to be convicted of first degree murder. Rivera therefore forfeited this claim. (See *Pensinger, supra,* 52 Cal.3d at p. 1251; *Friend, supra,* 47 Cal.4th at p. 29.)

## J. Review of Sealed Transcripts of Trial Court's *Pitchess* Hearings and Withholding of Relevant Documents

Rivera requests that we independently review the sealed record of the trial court discovery rulings pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 in order to determine whether the trial court's in camera review process complied with the law. We have done so and conclude that the trial court did not abuse its discretion.

Before trial, Rivera filed a *Pitchess* motion seeking to discover documents from the prosecution concerning Officer Gray — in particular, evidence or complaints of "excessive force, aggressive conduct, unnecessary or excessive violence, unnecessary force, planting of evidence, false arrest, false statements in reports, false claims of probable cause, detaining

people without legal cause, interfering in the domestic relationships of citizens, or any other evidence of or complaints of dishonesty . . . ." Rivera later filed an amended motion containing appended police reports. The trial court found good cause to conduct an in camera review of Officer Gray's personnel file. After conducting an in camera review on June 6, 2005, the trial court granted the motion in part and denied it in part. The City of Merced moved for reconsideration and requested that the court reopen the in camera review to allow Merced to place additional information on the record and to clarify certain issues that arose during the hearing. On August 30, 2005, the trial court held a second in camera hearing. The trial court concluded that some of the information contained in the materials was discoverable and some was not, and ordered the discoverable information disclosed to the defense.

"When a defendant shows good cause for the discovery of information in an officer's personnel records, the trial court must examine the records in camera to determine if any information should be disclosed. [Citation.] The court may not disclose complaints over five years old, conclusions drawn during an investigation, or facts so remote or irrelevant that their disclosure would be of little benefit. [Citations.] *Pitchess* rulings are reviewed for abuse of discretion." (*People v. Winbush* (2017) 2 Cal.5th 402, 424.)

In this case, the record includes sealed transcripts of both in camera hearings and an envelope with sealed exhibits pertaining to Rivera's motion. After reviewing these documents, we conclude that there was no abuse of discretion. The custodian of records brought to the trial court "all 'potentially relevant' documents to permit the trial court to examine them for itself"; was placed under oath at the in camera hearing; and

stated for the record "what other documents (or category of documents) not presented to the court were included in the complete personnel record, and why those were deemed irrelevant or otherwise nonresponsive to the defendant's *Pitchess* motion." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1228–1229.) The trial court examined the information, made a record of and properly released to the defendant information it deemed discoverable, and otherwise complied with applicable law. (*Id.* at pp. 1225–1227, 1229–1230.)

## K. Admission of Evidence of Uncharged Misconduct

Rivera contends that the trial court prejudicially erred when it allowed the prosecutor to admit testimony about several incidents of uncharged misconduct involving Rivera's use of a firearm against Adel Mohammed, Larry Gonzalez, Marlon Bradley, and Edward Bradley. Specifically, Rivera contends that although the evidence of uncharged misconduct was admitted as evidence of predicate offenses involving the Merced Gangster Crips gang, the jury was permitted to consider it for the purpose of showing premeditation, deliberation, intent, and gang-related motive with respect to the charged crimes involving McIntire and Office Gray.

During opening argument, the prosecutor mentioned two prior instances involving Rivera's alleged relationship with his "gang and guns": one in 2000 in which Rivera, who was accompanied by several other people, pulled a gun on two young men who were sitting in a car outside a liquor store, and another in 2001 in which Rivera fired between six and eight shots on a group of men in a residential neighborhood in Merced. Mohammed, Marlon Bradley, and Jamilah Peterson were all permitted to testify about these events. In closing, the

prosecutor alluded to the Merced shooting to argue that Rivera premeditated the murder of Officer Gray: "Remember the jury instruction on premeditation says it will vary with each individual. How long do you think it took this individual to decide to kill? How long do you think it took for him to decide to fire three shots at Aaron McIntire and Kimberly Bianchi four days before? How long do you think it took for him to fire six shots at Marlon Bradley three-and-a-half years before that?" The prosecutor also argued: "[Rivera] made the decisions that took him a little further and a little further . . . . We're not even talking one shot, Ladies and Gentlemen; we're talking two shots. You got to pull that trigger twice. He had to pull it three times with Bianchi and McIntire, like he had to pull it six times with Marlon Bradley."

"Evidence that a defendant has committed crimes other than those currently charged is not admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. [Citation.] Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent." (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) "On appeal, the trial court's determination of this issue, being essentially a determination of relevance, is reviewed for abuse of discretion." (*Ibid*.)

The Attorney General argues that evidence of the two instances of uncharged misconduct were relevant to prove

Rivera's state of mind at the time he committed the charged offenses, including premeditation, deliberation, and a gang-related motive. "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." ' " (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402, quoting *People v. Robbins* (1988) 45 Cal.3d 867, 879.) Only "[t]he least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Ewoldt*, at p. 402.)

Here, Marlon Bradley testified about a 2001 shooting after a conflict between two rival gangs at a party. After being encouraged by a fellow member of the Merced Gangster Crips to "[h]it them niggers," Rivera shot six to eight bullets from a revolver in the direction of Bradley and two other men, but missed. This incident meets the standard of admissibility to show intent, premeditation, and gang-related motive with respect to the shooting of Aaron McIntire, in which Rivera allegedly shot a gun while accompanied by a fellow member of the Merced Gangster Crips. The incident in which Rivera, accompanied by a couple of other people, brandished a firearm at Mohammed and Gonzalez as they sat in a car is similarly probative of Rivera's intent with respect to shooting at McIntire, who was also sitting in a car.

But the Attorney General does not explain what made these uncharged offenses sufficiently similar to the shooting of Officer Gray, which occurred four years later and involved facts and circumstances different from both a nonlethal gang-directed shooting and an incident involving pointing a firearm at two men sitting in a car. We are therefore skeptical that the uncharged offenses were admissible for the purpose of proving

premeditation, deliberation, or a gang-related motive with respect to the shooting of Officer Gray.

Nevertheless, Rivera did not object to the prosecutor's use of the evidence of uncharged misconduct for the purpose of supporting a theory of premeditation or deliberation with respect to the killing of Officer Gray, nor did he object to the use of CALJIC No. 2.50, which instructed the jury that the evidence of uncharged misconduct could be used to show intent or gang-related motive. Any objection to the use of the evidence for these purposes is therefore forfeited. (*Pensinger*, *supra*, 52 Cal.3d at p. 1251; *Friend*, *supra*, 47 Cal.4th at p. 29.)

## L.  Cumulative Effect of Guilt Phase Errors

Rivera contends that his convictions should be reversed because the cumulative prejudice of the alleged errors during the guilt phase violated his due process right to a fundamentally fair and reliable trial under the California and federal Constitutions. We have found or assumed several errors: the trial court's instruction on a factually inadequate theory of liability for the special circumstance allegation of murder to prevent arrest or escape from lawful custody; the trial court's failure to instruct on the elements of assault; the prosecutor's reference to evidence not admitted into the record as corroborating evidence; the prosecutor's misstatement of the law about a gang member's eligibility for second degree murder; and the trial court's admission of uncharged misconduct to support the prosecution's argument that Rivera premeditated the murder of Officer Gray. As discussed, each of the errors was individually harmless. Because they largely relate to distinct offenses and unrelated evidentiary issues, we conclude that they do not cumulatively amount to prejudice requiring reversal of

Rivera's conviction. (See, e.g., *Moore*, *supra*, 51 Cal.4th at pp. 417–418 ["The three errors we have concluded or assumed occurred below, each individually harmless, related to distinct procedural or evidentiary issues not closely related to one another. We see no possibility their individual effects, if any, cumulatively resulted in prejudice to defendant."].)

## III. PENALTY PHASE AND SENTENCING ISSUES

### A. Admission of Juvenile Adjudications

Rivera contends the trial court erred at the penalty phase by admitting, over his objection, evidence of his juvenile adjudications and his commitment as a ward of the juvenile court at ages 15 and 16.

"Section 190.3, factor (b), permits the penalty phase jury to consider '[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.' " (*People v. Combs* (2004) 34 Cal.4th 821, 859 (*Combs*), quoting Pen. Code § 190.3, factor (b).) " ' "Evidence of prior criminal behavior is relevant under section 190.3, factor (b) if it shows 'conduct that demonstrates the commission of an actual crime, specifically, the violation of a penal statute. . . .' " ' " (*Combs*, at p. 859, quoting *People v. Hughes* (2002) 27 Cal.4th 287, 382.) Accordingly, "although the fact of a juvenile adjudication is inadmissible as a factor in aggravation" because juvenile adjudications "are not 'prior felony convictions' within the meaning of section 190.3, factor (c)," such adjudications may be admissible under factor (b), which "involves evidence of violent conduct other than the capital crimes, regardless of when the misconduct occurred or whether it led to a criminal conviction." (*People v. Taylor* (2010) 48 Cal.4th 574, 652–653

(*Taylor*).) The trial court therefore did not err by admitting Jeff Kettering's testimony referring to Rivera's juvenile adjudication involving criminal threats and brandishing a deadly weapon as evidence of "criminal activity" under section 190.3, factor (b).

Rivera argues that the high court's decisions in *Roper v. Simmons* (2005) 543 U.S. 551, *Graham v. Florida* (2010) 560 U.S. 48, *Miller v. Alabama* (2012) 567 U.S. 460, and *Hall v. Florida* (2014) 572 U.S. 701 [134 S.Ct. 1986] operate to preclude admission of his juvenile criminal activity and that the jury's consideration of such evidence is barred by the Eighth and Fourteenth Amendments.

"It is well established the federal Constitution does not bar consideration of unadjudicated criminal offenses." (*People v. Bramit* (2009) 46 Cal.4th 1221, 1239.) "*Roper* does not compel exclusion of such evidence." (*Taylor*, *supra*, 48 Cal.4th at p. 653.) "That case holds that the execution of individuals who were under 18 years of age at the time of their capital crimes is prohibited by the Eighth and Fourteenth Amendments. It says nothing about the propriety of permitting a capital jury, trying an adult, to consider evidence of violent offenses committed when the defendant was a juvenile. An Eighth Amendment analysis hinges upon whether there is a national consensus in this country against a particular punishment. [Citations.] Defendant's challenge here is to the admissibility of evidence, not the imposition of punishment." (*Bramit*, at p. 1186.) We have also observed that the same reasoning applies to *Miller v. Alabama* and *Graham v. Florida*. We concluded these cases "do not address the question of whether evidence of juvenile misconduct can be considered on the question of what punishment a defendant may receive for crimes committed as an adult." (*People v. Rices* (2017) 4 Cal.5th 49, 87.) We also

observed that the high court's more recent decision in *Hall v. Florida* was "even further afield from this question" because the U.S. Supreme Court "never suggested that evidence of juvenile misconduct may not be admitted in deciding the proper punishment for crimes an adult commits." (*Rices*, at p. 87.) The jury's consideration of Kettering's testimony concerning Rivera's juvenile criminal activity was permissible.

## B. Admission of Rivera's Postcrime Statements and Conduct

During the penalty phase, Sergeant Carbonaro testified about an incident on April 18, 2006 in which Rivera allegedly flooded his cell and referred to Officer Gray. Sergeant Carbonaro testified that Rivera "was causing a disturbance. He was flooding out his cell. . . . He was angry because he could not be rehoused. He wanted to be rehoused down in general population. . . . He made a statement that he didn't — he thought that this was unfair. Everybody else gets a chance and that just because some pig got killed he was there." Sergeant Carbonaro explained that she understood Rivera to be referring to Officer Gray. At the time, Rivera objected that there was a videotape of the incident without any indication Rivera ever made those statements; that the testimony was more prejudicial than probative; and that the prosecution may not present any evidence that Rivera was allegedly not remorseful unless Rivera presents evidence that he is remorseful for his crimes. Acknowledging that the testimony could not be admitted to show lack of remorse except in rebuttal, the trial court allowed the testimony under Penal Code section 190.3, factor (a) as "[c]ircumstances of the crime showing his attitude towards the victim." Rivera contends that the trial court committed

prejudicial error by allowing the testimony as an aggravating factor.

"Overt remorselessness [at the immediate scene of the crime] is a statutory sentencing factor . . . because factor (a) of [Penal Code] section 190.3 allows the sentencer to evaluate all aggravating and mitigating aspects of the capital crime itself. Moreover, there is nothing inherent in the issue of remorse which makes it mitigating only. The defendant's overt indifference or callousness toward his misdeed bears significantly on the moral decision whether a greater punishment, rather than a lesser, should be imposed. [Citation.] [¶] On the other hand, postcrime evidence of remorselessness does not fit within any statutory sentencing factor, and thus should not be urged as aggravating." (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1232, italics omitted.)

Assuming without deciding that the admission of Rivera's alleged statement about Officer Gray was error, we see no reasonable possibility any error affected the jury's death verdict. (*Chapman*, *supra*, 386 U.S. at p. 24; *People v. Nelson* (2011) 51 Cal. 4th 198, 218, fn. 15.) The jury heard other properly admitted evidence of Rivera's disparaging statements about Officer Gray, such as, "I hate Officer Gray. I hate Officer Gray. Fuck Officer Gray." The alleged comment labeling Officer Gray a "pig" therefore was unlikely to have affected the verdict. Furthermore, the prosecution presented other aggravating evidence in support of a death verdict, including the circumstances of the crime and Rivera's attempts to evade capture, Rivera's prior felony convictions, and his prior instances of violent criminal conduct, including the shooting incident involving Bianchi and McIntire. Nothing about the jury's request for a read-back of Sergeant Carbonaro's testimony

(along with other testimony from prosecution and defense witnesses during its deliberations) suggests that this testimony tipped the scales in favor of death.  We therefore conclude that any error in admitting the testimony was harmless beyond a reasonable doubt.

Rivera also contends that the trial court abused its discretion under Evidence Code section 352 by admitting Sergeant Carbonaro's testimony.  Rivera initially argued that the evidence was more prejudicial than probative because a videotape of the incident did not indicate that Rivera said what the statements alleged.  Although the trial court ruled on the factor (a) relevance argument, it did not state on the record that it had weighed potential prejudice against probative value under section 352.  But Rivera's memorandum of points and authorities in support of his motion to exclude the evidence focused only on the factor (a) question and whether evidence showing lack of remorse could be admitted.  It was therefore understandable that the trial court's comments focused on the issue.

"[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352." (*People v. Taylor* (2001) 26 Cal.4th 1155, 1169.)  Although the court's final orders did not acknowledge section 352, the record suggests that the trial court was aware of its responsibilities and performed its balancing functions.  The trial court heard both counsel's arguments before and during the hearing held pursuant to Evidence Code section 402.  At that hearing, the trial court provided a detailed explanation of why it was allowing the evidence.  Furthermore, evidence of Rivera's

statements regarding his attitude toward Officer Gray was probative. (See *People v. Payton* (1992) 3 Cal.4th 1050, 1063 ["Evidence of statements from defendant's own mouth demonstrating his attitude toward his victims was highly probative."].) The trial court did not abuse its discretion under Evidence Code section 352 by admitting this evidence.

Finally, Rivera argues that, aside from Rivera's alleged "pig" statement, Sergeant Carbonaro's accompanying testimony about Rivera causing a disturbance by flooding his cell with water from the toilet and subsequently being removed from his cell was irrelevant and unduly prejudicial. He contends that the incident did not constitute "criminal activity" to be admitted as an aggravating factor under factor (b).

This argument fails. There is no indication that the prosecutor argued that the flooding incident itself should be considered an aggravating factor or that the jury improperly considered the incident as evidence in aggravation. Any error in admitting the evidence was therefore harmless.

## C. Jury's Use of Allegedly Invalid Sentencing Factor

Rivera argues that his death judgment must be reversed and the case remanded for a new penalty trial because of the court's use of a jury instruction containing an invalid theory concerning the special circumstance allegation of murder to prevent arrest or escape from lawful custody. (See Part II.E, *ante*.) Although Rivera does not challenge the validity of the jury's true finding concerning a separate special circumstance eligibility factor — murder of a peace officer engaged in the performance of his duties — Rivera argues that reversal is required because the jury should not have given any

aggravating weight to the facts and circumstances that the murder was to prevent arrest or escape from lawful custody.

"An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances." (*Brown v. Sanders* (2006) 546 U.S. 212, 220 (*Brown*); see *People v. Debose* (2014) 59 Cal.4th 177, 196.) Sentencing factor (a) permits jurors to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . ." (Pen. Code § 190.3, subd. (a).)

The facts and circumstances supporting the jury's true finding that the murder was committed to prevent arrest or escape from lawful custody were properly available for consideration as "circumstances of the crime of which the defendant was convicted." (Pen. Code, § 190.3, subd. (a).) The jury was further entitled to consider these facts and circumstances in support of the special circumstance allegation that the murder involved the intentional killing of a peace officer engaged in the performance of his duties. (See *id.*, § 190.2, subd. (a)(7).) There was therefore no constitutional violation in permitting the jury to give aggravating weight to these facts and circumstances. (*See Brown, supra*, 546 U.S. at p. 222–224; *People v. Maciel* (2013) 57 Cal.4th 482, 521 [concluding that no reversal was required because even if there were insufficient evidence to support the jury's true finding of the special circumstance of multiple murder, the jury would have heard the same evidence in support of the prosecution's alternate theory].)

## D. Refusal To Instruct on Lingering Doubt

During the penalty phase trial, Rivera requested the following instruction: "A juror who voted for conviction at the guilt phase may still have a lingering or residual doubt as to whether the defendant premeditated and deliberated the murder of Officer Gray. Such a lingering or residual doubt, although not sufficient to leave you with a reasonable doubt at the guilt phase, may still be considered as a mitigating factor at the penalty phase. Each individual juror may determine whether any lingering or residual doubt is a mitigating factor and may assign it whatever weight the juror feels is appropriate." The trial court refused to give the requested instruction but indicated that it would permit Rivera to argue lingering doubt to the jury. While acknowledging that we have previously held otherwise, Rivera argues that he was entitled to an instruction on lingering doubt and that the trial court's refusal to provide the instruction violated Rivera's constitutional rights and requires reversal of the death judgment. We conclude that there was no error.

"Although the jurors may consider lingering doubt in reaching a penalty determination, there is no requirement under state or federal law that the court specifically instruct that they may do so." (*People v. Boyce* (2014) 59 Cal.4th 672, 708.) The trial court instructed the jury with CALJIC No. 8.85, factor (k), which "tells the jury that it may consider '[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial.' . . . That instruction sufficiently encompasses the concept of

lingering doubt." (*Boyce*, at pp. 708–709, italics omitted.) The trial court was not required to provide any further instruction on lingering doubt.

## E. Death Penalty Statute as Unconstitutional and a Violation of International Law

Rivera argues that many features of California's death penalty statute violate the U.S. Constitution and international law. As Rivera acknowledges, we have repeatedly rejected similar claims, and Rivera provides no persuasive reason to revisit the following precedent:

"[T]he California death penalty statute is not impermissibly broad, whether considered on its face or as interpreted by this court." (*People v. Dykes* (2009) 46 Cal.4th 731, 813.) We have "reject[ed] the claim that section 190.3, factor (a), on its face or as interpreted and applied, permits arbitrary and capricious imposition of a sentence of death." (*Ibid.*; see *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976, 978.)

"The death penalty statute does not lack safeguards to avoid arbitrary and capricious sentencing . . . or constitute cruel and unusual punishment on the ground that it does not require either unanimity as to the truth of aggravating circumstances or findings beyond a reasonable doubt that an aggravating circumstance (other than Pen. Code, § 190.3, factor (b) or factor (c) evidence) has been proved, that the aggravating factors outweighed the mitigating factors, or that death is the appropriate sentence." (*People v. Rangel* (2016) 62 Cal.4th 1192, 1235.) "[A]t the penalty phase . . . no further facts need to be proved in order to increase the punishment to . . . death." (*People v. Griffin* (2004) 33 Cal.4th 536, 595.) Nothing in

*Hurst v. Florida* (2016) 577 U.S. __ [136 S.Ct. 616], *Cunningham v. California* (2007) 549 U.S. 270, *Blakely v. Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, or *Apprendi v. New Jersey* (2000) 530 U.S. 466, undermines these conclusions. (*Rangel*, at p. 1235, fn. 16.)

"No burden of proof is constitutionally required, nor is the trial court required to instruct the jury that there is no burden of proof." (*People v. Dement* (2011) 53 Cal.4th 1, 55.) The trial court need not instruct that there is a presumption of life, that if the mitigating factors outweigh the aggravating factors the jury should impose a sentence of life imprisonment without the possibility of parole, or that a jury need not be unanimous in finding the existence of a mitigating factor. (*People v. Williams* (2016) 1 Cal.5th 1166, 1204; *People v. Adams* (2014) 60 Cal.4th 541, 581; *Moore*, *supra*, 51 Cal.4th at pp. 1139–1140.) "[U]nanimity with respect to aggravating factors is not required by statute or as a constitutional procedural safeguard." (*People v. Taylor* (1990) 52 Cal.3d 719, 749.)

The language "so substantial" and "warrants" in CALJIC No. 8.88 is not impermissibly vague. (*People v. Romero and Self* (2015) 62 Cal.4th 1, 56.) The trial court was not required to delete inapplicable factors from CALJIC No. 8.85 (*People v. Watson* (2008) 43 Cal.4th 652, 701), or "instruct that the jury can consider certain statutory factors only in mitigation" (*Valencia*, *supra*, 43 Cal.4th 268, 311).

"The federal constitutional guarantees of due process and equal protection, and against cruel and unusual punishment [citations], do not require intercase proportionality review on appeal." (*People v. Mai* (2013) 57 Cal.4th 986, 1057.) "Moreover, 'capital and noncapital defendants are not similarly situated

and therefore may be treated differently without violating' a defendant's right to equal protection of the laws, due process of law, or freedom from cruel and unusual punishment." (*People v. Carrasco* (2014) 59 Cal.4th 924, 971.) " 'The death penalty as applied in this state is not rendered unconstitutional through operation of international laws and treaties.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 373.)

## F. Cumulative Effect of Guilt and Penalty Phase Errors

Rivera contends that the penalty judgment must be reversed due to the cumulative prejudice of the alleged errors during the guilt and penalty phases in violation of his due process right to a fundamentally fair and reliable trial under the California and federal Constitutions. We have assumed one error in the penalty phase: the trial court's decision to admit evidence of Rivera's postcrime statements and conduct under factor (a). Even if the trial court erred by admitting this evidence, it was not individually prejudicial and is unrelated to the previously discussed guilt phase errors. We conclude that no identified or assumed error, individually or cumulatively, requires reversal of the judgment. (See *People v. Bolden* (2002) 29 Cal.4th 515, 567–568.)

## G. Restitution and Parole Revocation Fines

Rivera contends, and the Attorney General agrees, that the trial court erred by imposing two fines in excess of the statutory maximum: a restitution fine of $23,600 imposed under Penal Code section 1202.4, subdivision (b), and a parole revocation fine of $23,600 imposed under Penal Code section 1202.45. The statutory maximum for each fine is $10,000. (Pen.

Code, § 1202.4, subd. (b); see *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1534 (*Blackburn*).)

Unauthorized sentences are those that " 'could not lawfully be imposed under any circumstance in the particular case' " (*People v. Smith* (2001) 24 Cal.4th 849, 852), including a trial court's imposition of a restitution fine in excess of the maximum amount permitted by the applicable statute (*Blackburn, supra*, 72 Cal.App.4th at p. 1534). An unauthorized sentence is reviewable on appeal regardless of whether it was objected to at trial. (*Smith*, at p. 852.) When a trial court imposes fines in excess of the statutory maximum, the proper remedy is to modify the judgment to reduce the fines to the statutory maximum. (*Blackburn*, at p. 1534.) Accordingly, we will modify the judgment to reduce the restitution fine pursuant to Penal Code section 1202.4, subdivision (b), to $10,000, and the parole revocation fine pursuant to Penal Code section 1202.45 to $10,000.

## CONCLUSION

We modify the judgment to reduce the restitution and parole revocation fines to $10,000 each. We affirm the judgment as modified.

**LIU, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Rivera

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S153881
**Date Filed:** May 23, 2019

_____

**Court:** Superior
**County:** Colusa
**Judge:** S. William Abel

_____

**Counsel:**

Stephen M. Lathrop, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell and Ronald S. Matthias, Assistant Attorneys General, Sean M. McCoy and Darren K. Indermill, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Stephen M. Lathrop
Law Offices of Lathrop & Villa
904 Silver Spur Road, #430
Rolling Hills Estates, CA  90274
(310) 237-1000

Darren K. Indermill
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 210-7689