Filed 3/16/23  P. v. Braggs CA2/5
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B301727 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA470870) |
| v. | |
| BOBBY BRAGGS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George G. Lomeli, Judge.  Reversed in part and affirmed in part.

Melissa J. Kim, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, William H. Shin, Roberta L. Davis and Scott A. Taryle, Deputy Attorneys General, for Plaintiff and Respondent.

The jury found defendant and appellant Bobby Braggs guilty of second degree robbery (Pen. Code, § 211 [count 1]),[1] and found true the allegations that Braggs used a firearm (§ 12022.53, subd. (b)), and committed the robbery at the direction of, in association with, or for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)).  The trial court found true the allegations that Braggs had suffered a prior strike conviction (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a prior serious felony conviction (§ 667, subd. (a)(1)), and had served three prior prison terms (§ 667.5, subd. (b)).

The trial court sentenced Braggs to a total of 16 years in prison, consisting of the middle term of three years for the robbery, doubled to six years under the three strikes law, plus 10 years for the gang enhancement.  The court struck the firearm use enhancement, as well as the enhancements for the prior serious felony conviction and the three prior prison terms, and imposed various fines and fees.

On appeal, Braggs contended that there was insufficient evidence to support the robbery conviction, the gang allegation, and the firearm allegation.  He further contended that the trial court violated his constitutional rights by failing to hold an ability to pay hearing prior to imposing certain fines and fees.  The majority affirmed the trial court's judgment.  Justice Baker concurred in part and dissented in part.  He disagreed insofar as the majority found that the evidence was sufficient to support the gang enhancement.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Braggs petitioned for review. The California Supreme Court granted review and transferred the matter back to this court with directions to vacate our decision and to reconsider the cause in light of *People v. Renteria* (2022) 13 Cal.5th 951 (*Renteria*) and Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333).

We vacate our April 27, 2021 opinion, and now issue this revised opinion addressing all of Braggs's arguments, including his arguments in supplemental briefing that the gang allegation is not supported by substantial evidence in light of *Renteria*, *supra*, 13 Cal.5th 951 and Assembly Bill 333. The People challenge Braggs's argument that the true finding on the gang allegation was not supported by substantial evidence under the law in place at the time Braggs was convicted, as that law has been explained in *Renteria*. The People concede, however, that the gang enhancement is not supported by substantial evidence under Assembly Bill 333, which applies to Braggs's case retroactively. The People contest Braggs's remaining contentions.

We affirm the robbery conviction and the true finding on the gun enhancement. We agree with Braggs, however, that the gang allegation is not supported by substantial evidence under that law at the time of his jury trial conviction, as clarified by *Renteria*.[2] We reverse the true finding on the gang enhancement

---

[2] Because we reverse based on *Renteria*, *supra*, 13 Cal.5th 951, which requires reversal without permitting the People to retry the gang allegation, we need not address the issue of the sufficiency of the evidence supporting the gang allegation under Assembly Bill 333, which would permit retrial.

and remand to the trial court for resentencing.  We do not address Braggs's arguments regarding his ability to pay fines and fees, which may be presented to the trial court during resentencing.

## FACTS[3]

### *The Robbery*

On the afternoon of August 19, 2018, the victim was leaving a marijuana shop when Braggs approached him and asked him where he was from.  The victim understood that Braggs was asking whether he was a gang member.  He responded, "I don't gangbang."

As the victim was walking to his car, he noticed Braggs following him.  Braggs approached him, and pulled a semiautomatic gun out of his waistband.  Braggs pulled back the slide of the gun to chamber a bullet, pointed the gun at the victim, and said, "Give me everything."  Fearing for his life, the victim gave Braggs some gold jewelry and a red Ferragamo belt he was wearing.  Braggs took the items and ran away.

The victim got into his car and followed Braggs.  Braggs then ran toward the victim's car and pointed the gun at the victim.  The victim feared he would be shot and drove away.  Once out of harm's way, the victim pulled over and called the police.

---

[3] The facts are recounted as presented by the prosecution. Braggs did not put on a case in his defense.

*The Investigation*

Los Angeles Police Department Officer Michael Dzwoniarek responded to the robbery report. The victim described the robber to Officer Dzwoniarek as a bald Black man with a black beard and brown eyes, who was about five feet and four inches tall, weighed about 175 pounds, and was wearing thin black glasses. The victim told the officer the robber took eight items from him: a red Ferragamo belt with a red and gold buckle containing the Ferragamo logo; a gold Versace chain with a Versace symbol pendant; a gold rope chain with a pendant shaped like a money bag; a diamond Rolex ring; a gold Franco bracelet; a ring with a planet Earth symbol; and two gold rings with nugget diamonds.

Los Angeles Police Department Detective Emily Delph obtained a video of the incident taken by a security camera.[4] The camera captured a portion of the sidewalk and street where the robbery occurred. The video shows in its upper left corner, from a distance, an interaction between two men. Other individuals can be seen standing nearby. The interaction is partially obstructed by parked cars. Afterwards, a bald, bearded Black man wearing glasses is depicted walking away from where the interaction occurred, through the middle of the camera's range. The man appears to be holding a belt. The man can be seen reaching toward his waistband several times, as if holding or adjusting something in the waistband, until he walks out of the camera's view.

---

[4] The video was played for the jury at trial.

5

Detective Delph was trained to recognize a person carrying a concealed weapon, and she testified that it is common for someone carrying a firearm in their waistband to touch or manipulate the gun to secure it. She used the video to identify Braggs as a suspect. She then created a six-pack photographic lineup that included a picture of Braggs, which she e-mailed to the victim. The victim responded that he believed Braggs was the robber.

The victim described his stolen belt to Detective Delph as red with a red and gold buckle. The belt was never photographed, and the victim was never shown a photograph of the belt or asked to identify the belt after it was later recovered.

On August 26, 2018, Braggs was pulled over for a traffic violation. Officers recovered a worn, red Ferragamo belt with a gold and red buckle from the back of the car. The arresting officer estimated that Braggs was approximately five feet six or seven inches tall, and weighed 145 to 160 pounds.

### The Victim's Statements Regarding the Robber's Identity

At the preliminary hearing, the victim testified that he was sure of his identification of Braggs as the robber. When the victim made the identification from the lineup Detective Delph sent him, he looked at the array a few times and was sure of his identification. He testified, " 'I had a photographic memory of him in my head. I know what he looked like.' " When asked about the fact that only two of the six men in the array were wearing glasses, the victim said he had not noticed. He picked Braggs's photograph because he knew Braggs was the robber. When he reviewed the array again after it was pointed out that

only two of the six men were wearing glasses, he maintained that Braggs was the robber.

At trial, the victim described the robber as approximately six feet tall, bigger and broader than himself, with a caramel-color skin tone that differed from Braggs's dark skin tone, facial hair, and thin blue rectangular glasses. The victim did not remember describing the robber to police as being about five feet four inches tall, about 175 pounds, and in his 40's. He agreed the robber was older than him and could have weighed about 175 pounds. The victim testified that he had seen the robber at the marijuana shop on another occasion before the date of the robbery, and the robber was not Braggs. The victim knew the robber continued to go to the marijuana shop. The victim testified that he had not been to the shop himself since the robbery; the victim was not asked to explain how he knew that the robber had continued to go to the shop.

The victim explained that he identified Braggs in the lineup Detective Delph sent him because Braggs looked "the closest" to the robber and Braggs was the only person in the lineup with a bald head and glasses. He identified Braggs at the preliminary hearing because he "wanted somebody to go down for the crime."[5]

The victim also testified at trial that police had shown him a photograph of the belt, and he had misidentified it as the one taken from him during the robbery. The belt was not his. The victim said it was his because it looked "familiar." He knew the belt was not his because it did not look worn enough, and the belt

---

[5] The victim was impeached at trial with his preliminary hearing testimony.

buckle was gold.  His belt had a silver buckle.  He explained that he was not thinking clearly when he told Detective Delph that the buckle was gold a few days after the robbery.  The victim's grandmother had given him the belt on his 18th birthday about five years before the trial.  The victim appreciated designer belts and was knowledgeable regarding them.

### *Gang Evidence*

Los Angeles Police Department Officer Mark Rakitis was one of the officers who arrested Braggs.  He testified as an expert on the Eight Tray Gangster Crips gang (Eight Tray).  The gang had between 200 and 250 active members, and its primary activities included felony vandalism, vehicle theft, sales and transportation of illegal narcotics, unlawful possession of firearms, aggravated assault, robbery, mayhem, and murder.

Officer Rakitis opined that Braggs was an Eight Tray member.  Several factors led the officer to this conclusion: Braggs had told Officer Rakitis that he was a former member of Eight Tray, and Braggs was driving through Eight Tray territory with a known active Eight Tray gang member when he was arrested.  The officer explained that gang members often told police officers they were former members of a gang to avoid admitting active gang membership.  The robbery was committed in Eight Tray territory, and robbery was one of the gang's primary activities.

Based on a hypothetical scenario mirroring the facts of this case, Officer Rakitis opined that the robbery was committed for the benefit of Eight Tray.  He explained that the question, "Where are you from" was "a challenge of gang affiliation" that

the victim understood. The subsequent commission of a robbery within the gang's territory would benefit the gang by creating a reputation for violence and power. The location where the robbery was committed was Eight Tray territory, but control over it was contested by a rival gang. Gangs maintain their territory by committing crimes within it to intimidate members of the community, dissuade community members from cooperating with police, prevent encroachment by rival gangs, and attract new young members.

Officer Rakitis sometimes had difficulty convincing witnesses who lived in Eight Tray territory to testify in court and cooperate with law enforcement. People who lived in the gang's territory told the officer they were afraid the gang would target them or their families. The victim in this case lived within Eight Tray territory.

## DISCUSSION

### *Sufficiency of the Evidence*

Braggs challenges the sufficiency of the evidence against him with respect to his conviction for robbery and the true findings on the gang and firearm use allegations. We conclude that substantial evidence supports Braggs's conviction and the jury's true finding with respect to the gun use allegation. Substantial evidence does not support the jury's finding that Braggs committed a felony for the benefit of, at the direction of, or in association with a criminal street gang with the intent to promote, further, or assist in criminal conduct by gang members, however. We reverse the true finding on the gang allegation and

9

remand the matter to the trial court for resentencing, but otherwise affirm the judgment.

## **Legal Principles**

When reviewing for sufficiency of the evidence, " ' " [t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " ' " (*People v. Casares* (2016) 62 Cal.4th 808, 823, disapproved of on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214; see *People v. Clark* (2011) 52 Cal.4th 856, 942–943; *Jackson v. Virginia* (1979) 443 U.S. 307, 321 [federal due process requires proof "sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt"].) " 'The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence.' [Citation.] '. . . [I]t is the jury rather than the reviewing court that weighs the evidence, resolves conflicting inferences and determines whether the People have established guilt beyond a reasonable doubt.' " (*Casares*, at p. 823.) This standard applies to assessing the sufficiency of the evidence to support a true finding on an enhancement allegation. (*People v. Vargas* (2020) 9 Cal.5th 793, 820.)

## **Robbery**

Braggs claims that the evidence presented was insufficient to support his robbery conviction because the victim recanted his

identification and gave a reasonable explanation for why his testimony at trial differed from his statements to law enforcement and his testimony at the preliminary hearing. Braggs concedes that a single eye witness identification may be sufficient to establish a perpetrator's identity beyond a reasonable doubt, but argues that in this case the victim's testimony is inherently improbable, and the conviction must be reversed.

We disagree with Braggs's conclusion that the victim's initial testimony was inherently improbable simply because the victim offered a cogent explanation for his starkly different testimony at trial; the prosecution offered an equally cogent reason to support the conclusion that the victim's statements to law enforcement and at the preliminary hearing were true. The victim was very confident of his identification of Braggs in his earlier descriptions, stating that he had a "photographic memory" of Braggs. Officer Rakitis explained that gangs often intimidated witnesses, and that it was not uncommon for a witness to recant an identification at trial out of fear of violence. The jury could reasonably infer that the victim, who lived within gang territory, changed his testimony because he was afraid of reprisal. It is of no moment that the record also includes sufficient evidence that could support a finding that the victim lied when he first identified Braggs because he was angry and wanted someone to "go down for the crime." There was substantial evidence in support of both positions, and it was the jury's duty to determine which version of the victim's testimony to credit. (Evid. Code, § 411 [testimony of single witness is generally sufficient to prove any fact]; *People v. Rivera* (2019) 7 Cal.5th 306, 331 (*Rivera*) [" 'If the circumstances reasonably justify the trier of fact's findings,

reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding' "]; *People v. Friend* (2009) 47 Cal.4th 1, 41 (*Friend*) [conflicts in evidence are for jury to resolve; where jury has credited statements by witness, appellate court can reject those statements only if they are physically impossible or facially false].)

Moreover, the victim's identification of Braggs as the perpetrator based on the photographic array was corroborated by other evidence presented at trial. The victim originally described to Detective Delph the belt that Braggs stole as red, with a Ferragamo logo and a gold buckle. A belt of that description was found in the backseat of the car Braggs was driving when he was arrested. The probability of the wrong belt and the wrong man matching the descriptions that the victim initially gave was low in light of the distinctive appearance of the belt. The video also depicts a man carrying a belt. The appearance of the man on the video is consistent with Braggs's appearance and with the victim's initial description of the perpetrator. The jury could reasonably conclude that the man depicted in the video was Braggs. We will not second guess the jury's finding that Braggs is the individual who committed the robbery, as there is substantial evidence on which to base such a finding. (Evid. Code, § 411; *Rivera, supra,* 7 Cal.5th at p. 331; *Friend, supra,* 47 Cal.4th at p. 41.)

**Firearm Use Enhancement**

Section 12022.53, subdivision (b) provides that "any person who, in the commission of a [robbery], personally uses a firearm,

shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. The firearm need not be operable or loaded for this enhancement to apply." Toy guns do not qualify as a firearm, nor do pellet guns or BB guns. (*People v. Monjaras* (2008) 164 Cal.App.4th 1432, 1435 (*Monjaras*).) Whether a defendant used a firearm in the commission of the robbery is for the trier of fact to decide and may be established by direct or circumstantial evidence. (*People v. Wilson* (2008) 44 Cal.4th 758, 806; *People v. Rodriguez* (1999) 20 Cal.4th 1, 12–13.

Braggs first argues that the firearm enhancement is not supported by substantial evidence because a gun is not visible in the surveillance video of the robbery. The argument lacks merit. The victim testified that the robber pointed a gun at him both during the robbery and when the victim attempted to retrieve his possessions by driving his car to follow the robber. Although no gun is depicted in the video, the video does not show the robbery in its entirety. The interaction takes place at the point furthest away from the camera's view, and the perpetrator's hands are not always visible. The video does not depict any part of the interaction between the robber and the victim after the robber stole the victim's property and the victim pursued him. Because the video does not preclude the possibility that a gun was used, the victim's testimony was not inherently improbable, and is sufficient to support the finding that Braggs used a gun in the robbery. (Evid. Code, § 411; *Rivera, supra*, 7 Cal.5th at p. 331; *Friend, supra*, 47 Cal.4th at p. 41.)

Additionally, Detective Delph, who had been trained to identify when a person was carrying a concealed weapon, testified that people will often carry concealed weapons in their

13

waistbands, and that law enforcement officers are taught to focus on a suspect's hand motions to determine whether an individual has a weapon. The detective testified that it is "common for a person with a gun in the waistband to touch it or manipulate it with their hand, or maybe to touch it to secure it." The video depicted Braggs, as he walked away from where he robbed the victim, touching his waistband in a manner consistent with the detective's description of a person carrying a concealed weapon. A jury could reasonably conclude that Braggs used a firearm in commission of the robbery, based on Braggs's movements shown in the video.

Braggs next argues that the victim's visual observation of the gun was insufficient to establish that the weapon was real. We disagree. The victim testified that when the robber approached him, he pulled out a gun, cocked the weapon, pointed it at the victim, and ordered the victim to "[g]ive me everything you've got." The victim was familiar with firearms through exposure to them at a gun range. He understood the difference between a revolver and a semi-automatic gun, and identified the robber's gun as a semi-automatic weapon. The victim demonstrated the robber's actions in court, which the prosecutor verbally described as "—the witness has reached under—with his right hand under his shirt at his left waist, pantomimed removing what appears to be—pantomiming removing a firearm from his left waistband and pulling—pulling the slide of the firearm back and releasing." The victim agreed with the prosecutor's description. The victim testified that he understood that by "cock[ing]" the gun the robber was loading a bullet in the chamber.

Although it is unclear, Braggs appears to contend that a victim's testimony that he or she visually observed a firearm does not constitute a "sensory perception" of the firearm, and is therefore insufficient to establish that the weapon is a real firearm and not a toy.  He urges us to reject *Monjaras*, *supra*, 164 Cal.App.4th 1432, which held that " 'words and actions, in both verbally threatening and in displaying and aiming [a] gun at others, [can] fully support[ ] the jury's determination the gun was sufficiently operable [and loaded].' "  (*Id*. at p. 1437.)

We do not interpret the relevant case law to suggest that seeing a firearm is not in itself a sensory perception, but even if additional sensory perception were required, Braggs's use of the weapon was consistent with the use of an actual firearm, and would be sufficient to support the jury's firearm use finding.  In *Monjaras*, *supra*, 164 Cal.App.4th at page 1436, the "defendant demanded of the female victim, 'Bitch, give me your purse,' then pulled up his shirt and displayed the handle of a black pistol tucked in his waistband.  The victim, who had seen guns before but had never handled one, testified she immediately saw that the pistol looked like a gun, and it made her scared.  She 'assumed' the pistol was 'real' and handed over her pocketbook.  When asked by [the] defendant's trial attorney what the pistol was made of, the victim said:  'Probably metal because—I don't know.  Wasn't wood, wasn't plastic.  I don't know if it was plastic or metal. . . .  He don't show it to me.  He just do "this" to me [pulled up his shirt and displayed the pistol].'  The victim then conceded that she could not say for certain whether it was 'a toy or real or not.' "  The Court of Appeal held that the "jury was not required to give defendant the benefit of the victim's inability to say conclusively the pistol was a real firearm.  This is so because

15

'[the] defendant's own words and conduct in the course of an offense may support a rational fact finder's determination that he used a [firearm].' [Citation.]Indeed, even though for purposes of section 12022.53, subdivision (b), a firearm need not be loaded or even operable, 'words and actions, in both verbally threatening and in displaying and aiming [a] gun at others, [can] fully support[ ] the jury's determination the gun was sufficiently operable [and loaded].' [Citation.}Accordingly, jurors 'may draw an inference from the circumstances surrounding the robbery that the gun was not a toy.' " (*Id.* at pp. 1436–1437.)

In this case, the evidence that Braggs used a firearm to threaten the victim was even stronger than the evidence that was found to be sufficient in *Monjaras*. Unlike the victim in *Monjaras*, here the victim's certainty that what he saw was a firearm was not brought into question at trial. The victim testified he was familiar with firearms and how they operated, and identified the gun that Braggs used in the robbery as a semi-automatic weapon. Even if the victim's visual identification was insufficient, the jury could infer from the manner in which Braggs used the gun that it was not a toy. Our Supreme Court has held, "If the weapon cannot be found, the jury may be instructed by the court that it may draw an inference from the circumstances surrounding the robbery that the gun was not a toy. Testimony to the effect that the defendant was flourishing the pistol or pointing it at the victim and was using threatening words or conduct indicating that he intended to fire it if his demands were not met would be evidence from which the inference could be drawn." (*People v. Aranda* (1965) 63 Cal.2d 518, 533.) Here, the victim testified that the robber "cocked" the gun, and pantomimed the robber pulling back the slide to

16

chamber a bullet. He testified that the robber demanded that he give him everything he had while pointing the gun at him. This is substantial evidence from which a jury could reasonably conclude that the gun was real.

### Gang Allegation

"Section 186.22 adds various sentencing enhancements for gang-related felonies" to the Penal Code. (*People v. Mejia* (2012) 211 Cal.App.4th 586, 613.) At the time of Braggs's trial, "section 186.22[, subdivision (b)(1)(C)] require[d] proof of only two elements: (1) that the defendant committed a felony for the benefit of, at the direction of, or in association with any criminal street gang and (2) that he did so with the intent to promote, further, or assist in criminal conduct by gang members." (*Ibid.*, italics omitted.)

"Not every crime committed by a gang member is gang related. [Citations.] Nor can a crime be found to be gang related simply because the perpetrator is a gang member with a criminal history. [Citation.] Although a lone actor is subject to a gang enhancement, merely belonging to a gang at the time of the commission of the charged conduct does not constitute substantial evidence to support an inference the sole actor specifically intended to promote, further, or assist any criminal conduct by gang members." (*People v. Perez* (2017) 18 Cal.App.5th 598, 607.)

In *Renteria, supra,* 13 Cal.5th 951, our Supreme Court clarified what showing the prosecution must make under section 186.22, subdivision (b)(1)(C) when the defendant has acted

17

alone.[6] *Renteria* explained that "in cases where multiple gang members were involved in the charged offense, the fact of their joint involvement in a crime often provides sufficient evidence of association and benefit, as well as circumstantial evidence of an intent to promote the criminal activity of other gang members, in connection with the very same criminal offense." (*Id.* at p. 963.) "But in a case involving a lone actor, operation of the statute turns, at bottom, on the nature of the individual's actions and reasons for committing the underlying felony." (*Id.* at p. 965.)

"[D]ue process requires there be a significant connection between the defendant's 'guilty knowledge and intent' and the criminal conduct of the defendant's associates—that is, 'concrete' and 'practical' encouragement of 'specifically illegal activities.' " (*Renteria*, *supra*, 13 Cal.5th at p. 965.) Additionally, "the statute refers to the intent to promote 'criminal conduct by gang *members*' (§ 186.22(b)(1), (4), italics added), . . . [citation]—which, in a lone-actor case, necessarily means the promotion of conduct other than the commission of the underlying felony." (*Id.* at pp. 965–966.) Although the prosecution may present expert testimony on criminal street gangs to meet its burden, "[w]ithout more, generalized expert opinion that commission of a particular crime enhances the gang's power in the community by increasing its reputation for violence" is insufficient. (*Id.* at p. 966.) The

---

[6] *Renteria*, *supra*, 13 Cal.5th at page 961, did not address the effect of Assembly Bill 333, even though the legislation became effective while Rentaria's case was pending; because the court concluded that the evidence was insufficient to sustain the gang allegations even under the law at the time of the Rentaria's trial, there was no need to analyze the changes in law effected by Assembly Bill 333.

18

"statute requires a closer connection between the defendant's crime and the conduct of the gang and its members than generalized community reputation testimony can provide."  (*Id*. at p. 967.)  Reputation evidence must be "grounded in specific facts that show the defendant acted on behalf of a gang rather than for personal reasons."  (*Id*. at p. 968.)  Factors that courts have considered in this determination  include "whether the defendant's gang membership was apparent to observers, whether the victim was a gang member or rival of the defendant's gang, and whether retaliation for prior gang activity or disputes prompted the defendant's crime."  (*Ibid*.)

The requisite particulars set forth in *Renteria* are absent here.  Braggs acted alone in committing the crimes, and there is insufficient evidence of a "significant connection" between his intent in committing the robbery and the criminal conduct of other Eight Tray members.  (*Renteria, supra*, 13 Cal.5th at p. 965.)

Substantial evidence was presented to support the conclusion that Braggs was an Eight Tray member within the boundaries of the gang's territory, but section 186.22, subdivision (b)(1) "does not criminalize mere gang membership."  (*People v. Gardeley* (1996) 14 Cal.4th 605, 623–624; see *People v. Mesa* (2012) 54 Cal.4th 191, 196–197.)  Nor does the location where an offense took place speak to intent in the absence of other factors from which intent could be inferred.

The prosecution offered expert testimony that criminal activity by one gang member boosts the reputation of the gang overall thereby benefitting the gang, but this generic testimony was unsupported by evidence from which it could be inferred that Braggs intended to boost Eight Tray's reputation.  Braggs issued

19

a gang challenge by asking the victim where he was from.  The victim understood the challenge and was frightened by it.  Braggs did not announce which gang he belonged to, and there was no evidence adduced that the victim, or any bystander, knew Braggs's specific gang affiliation.  The victim did not indicate that he was from a rival gang, which might have supported an inference that he knew the identity of Braggs's gang.  The victim stated that he did not gangbang and gave no indication that he knew Braggs was from Eight Tray, rather than some other gang.

While the challenge plus the location within Eight Tray territory may have been probative under different circumstances, here the prosecution's gang expert testified that a rival gang was contesting Eight Tray's control over the area in which the offense took place, and that under such circumstances both gangs would commit crimes within the contested area to gain control over it.  There was no evidence that the victim or members of the community would have understood Braggs to mean he was a member of Eight Tray, as opposed to the rival gang, precisely because this was contested territory, as the expert testified.  Under these circumstances, there is insufficient evidence that Braggs's challenge would in fact benefit Eight Tray or that Braggs subjectively intended to benefit the gang.

The evidence indicates that Braggs's generic gang challenge benefitted him personally—people are afraid of gangs and are more likely to comply when confronted with a member of *any* gang.  That Braggs intended to benefit Eight Tray specifically is speculation.

Finally, there is no evidence that Braggs's conduct was intended to support specific criminal activity by other Eight Tray gang members.  The instant robbery cannot constitute the

20

criminal activity by other gang members that the statute requires—there must be "'concrete' and 'practical' encouragement of 'specifically illegal activities.'" (See *Renteria, supra,* 13 Cal.5th at p. 965.) The prosecution did not present evidence that Braggs's conduct did or would promote other specific criminal conduct by Eight Tray members. Accordingly, we must reverse the jury's finding that the robbery was committed for the benefit of a criminal street gang.

We accept the People's concession that, if this court were to conclude that the jury's finding was not supported by substantial evidence under the law at the time of Braggs's trial, as we do, double jeopardy bars retrial on that gang allegation. (*Burks v. United States* (1978) 437 U.S. 1, 11; *People v. Rodriguez* (2018) 4 Cal.5th 1123, 1129.)

## DISPOSITION

The true finding on the gang enhancement under Penal Code section 186.22, subdivision (b)(1)(C) is reversed and the matter is remanded to the trial court for resentencing. The judgment is otherwise affirmed. The court shall prepare an amended abstract of judgment reflecting the modified sentence and forward a copy of the abstract of judgment to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


MOOR, J.

We concur:


BAKER, Acting P. J.


KIM, J.