Filed 11/27/23  P. v. Gemmill CA3

NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>  v.<br><br>DEREK ANTHONY GEMMILL,<br><br>      Defendant and Appellant. | C096541<br><br>(Super. Ct. Nos. 17F5858,<br>18F2309) |

A jury convicted defendant Derek Anthony Gemmill of domestic violence against a dating partner, A.A., and child abuse of her daughter, M.M.  The jury found true that in one incident defendant personally inflicted great bodily injury on A.A.  (Pen. Code, § 12022.7, subd. (e).)[1]  Defendant contends that finding is not supported by substantial evidence, arguing it was based solely on A.A.'s loss of consciousness when defendant

---

[1]     Undesignated statutory references are to the Penal Code.

1

strangled her.  Defendant maintains that loss of consciousness without more does not constitute great bodily injury.  He is mistaken.  Evidence of loss of consciousness is sufficient to support a finding of great bodily injury.  We will affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In February 2018, A.A. started dating defendant.  At first, the relationship was good.  But in mid-April, defendant and A.A. argued and he headbutted her in the back of the head.  A.A. lost vision and experienced several days of back and neck pain.

On the night of April 23, 2018, defendant and A.A. argued because she wanted him to leave the house she shared with her friend, Rebecca D. and Rebecca's boyfriend, Tommy P.  Defendant initially refused to leave.  Once he agreed to leave, A.A. went with him.  They took A.A.'s car — with two-year-old M.M. in the backseat — because defendant did not have a car.  Defendant drove.  On the drive, defendant and A.A. again argued.  While driving, defendant hit A.A. multiple times in the nose and mouth.  She bled on her sweatshirt and used baby wipes to stop the bleeding.

Defendant drove to the house of Joshua S.  A.A. had met Joshua a few times before.  When they pulled in the driveway, there were people outside.  Defendant spoke to Joshua, who told him to go into the house.  Joshua asked A.A. if defendant had hit her and she said he had.  Joshua went into the house and defendant came back outside.  Defendant asked A.A., "Are you trying to get me fucking stabbed?"  Defendant got into the car and drove off with A.A. and M.M.  On the way, defendant again punched A.A. four to six times in the face and she lost consciousness.  As defendant struck A.A., her daughter was in the back seat yelling, "Mommy."  At an intersection, defendant grabbed A.A.'s hair and hit her again.  He asked, "Are you trying to get me killed?  Because I will kill all of us."  Defendant was driving 60 to 70 miles an hour when he abruptly turned the steering wheel and drove the car off a cliff into a ditch.  In the ditch, defendant punched and kicked the windshield, cracking it.

2

A.A. and M.M. were not injured during the crash. As A.A. tried to get out of the car, defendant grabbed A.A.'s hair and pulled her back into the car. A.A. managed to get out of the car, took M.M. out of her car seat, and laboriously climbed the hillside outside of the ditch that the car was in. When A.A. made it to the roadway with M.M., a man pulled over and asked if they needed a ride. Defendant reached the road as well and all three got into the car. A.A. directed the man to drive to the house she shared with Rebecca D. and Tommy P.

The next day A.A. confronted defendant on what he had done to her car. Defendant responded with an expletive. Defendant suggested they go to " 'your dad's or your family,' or my family." A.A. told defendant she did not want to go with him. Defendant became angry and grabbed A.A. by her hair. Defendant pulled A.A. onto the bed and began choking her with his right hand. A.A. was unable to talk and described that she could not breathe. A.A.'s vision became blurry and then her vision went black and she lost consciousness. When A.A. regained consciousness, defendant had packed their belongings and was standing over his duffle bag.

A.A. told defendant she was going to Rebecca D.'s room to get boxes for the move. A.A. ran into Rebecca's room and said that defendant was beating her and she thought he would kill her. A.A. took M.M. and locked herself and her daughter in Rebecca's bathroom. Seeing herself in the bathroom mirror, A.A. testified that she didn't recognize herself. She described that everything was swollen and bruised and she had dried blood all over her. Rebecca offered to drive A.A. and M.M. to A.A.'s father's house. A.A. and M.M. got in the backseat of Rebecca's truck and locked the door. Defendant came out of the house, got the truck door open through an open window, and struck A.A. multiple times. Tommy P. came out of the house and pulled defendant out of the truck. A struggle ensued between all parties until Tommy restrained defendant on the ground. Rebecca called law enforcement.

3

A.A. sustained a swollen upper lip, a lump on her forehead, and scrapes on her nose. Her entire face was "lumped up and bruised and bleeding." A.A. had tenderness along the right and left muscle groups along the back of her neck. She also had tenderness on her scalp and foreskull and bruising on her chest and breast. A.A. received stitches to close a laceration on her hand. She lost hearing in her left ear that persisted to the time of trial and had a harsh cough for over a week.

At trial, Dr. Sean Dugan, a physician, testified as an expert witness on strangulation, head trauma, and traumatic brain injury. He testified that strangulation may cause neck pain, changes in the voice, clotting in blood vessels to the brain, vision problems, dizziness, tingling in other parts of the body, coughing, hearing loss, and loss of consciousness.

Dr. Dugan explained that when the brain runs out of oxygen and blood from strangulation, which can take anywhere from five to 10 seconds, the person loses consciousness. For every second a person is unconscious, 32,000 brain cells are lost. Each brain cell has 10,000 connections; thus, for every second of unconsciousness, the person loses 230 million [*sic*] connections. These cells and connections are permanently lost. People who have been strangled to unconsciousness often report memory problems and memory loss. They lose memory around the time of the event and lose the ability to form new memories. The onset of symptoms may be delayed by hours to years.

An amended information charged defendant with attempted murder of both A.A. and M.M. (§§ 187, subd. (a), 664; counts 1 & 2), assault with a deadly weapon on both A.A. and M.M. (§ 245, subd. (a)(1); counts 3 & 4), two counts of corporal injury on a dating partner resulting in a traumatic condition, with a prior conviction (§ 273.5, subds. (a) & (f); counts 5 & 7), and child abuse of M.M. (§ 273a, subd. (a); count 6). Counts 1 through 4 were alleged to be serious felonies under section 1192.7, subdivision (c). The amended information also alleged a prior strike conviction under section 1170.12 as to all counts, as well as a prior serious felony conviction under section 667, subdivision (a)(1)

as to counts 1 through 4, and 7. As to count 7, the amended information alleged defendant personally inflicted great bodily injury upon A.A. under circumstances involving domestic violence (§ 12022.7, subd. (e)), causing this count to become a serious felony (§ 1192.7, subd. (c)(8)).

A jury found defendant not guilty of counts 1 and 2 and guilty of the remaining counts. The jury also found the great bodily injury allegation in count 7, true. In a bifurcated proceeding, the trial court found that defendant sustained the prior strike conviction. (§§ 1170.12, 667, subd. (a)(1).)

At the subsequent sentencing hearing, the trial court denied defendant's motions to dismiss the great bodily injury enhancement or to strike the prior strike allegation and imposed an aggregate prison sentence of 14 years eight months.

The court awarded defendant 1,729 days' credit and imposed various fees and fines.

Defendant filed a timely notice of appeal.

DISCUSSION

I

*Great Bodily Injury*

Defendant contends that the evidence was insufficient to support the great bodily injury enhancement. Defendant points out that the prosecutor told the jury that "not all strangulation leads to great bodily injury. The great bodily injury comes when you are strangled to unconsciousness." Defendant asserts that loss of consciousness without additional injury is insufficient to constitute great bodily injury, and, here, the only additional injuries A.A. suffered from strangulation were redness and tenderness of her neck, and a harsh cough, both of which defendant asserts were temporary.

We conclude that the jury's finding was supported by substantial evidence.

Section 12022.7, subdivision (f) defines " 'great bodily injury' " as "a significant or substantial physical injury." It is " ' "essentially equivalent" ' " to " 'serious bodily

5

injury' " as used in section 243, which includes a loss of consciousness that does not require medical treatment. (*People v. Wade* (2012) 204 Cal.App.4th 1142, 1149-1150; see *In re Cabrera* (2023) 14 Cal.5th 476, 490 (*Cabrera*) [recognizing that serious bodily injury and great bodily injury are essentially equivalent elements].) But these terms are not interchangeable, and a jury's finding of serious bodily does not necessarily establish great bodily injury. (*Cabrera*, at p. 485.) Ultimately, whether an injury constitutes great bodily injury is for the jury to determine based on the facts of each case. (*Id.* at p. 487.)

" 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction.' [Citation.] 'We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 331.) " ' "If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding." ' " (*People v. Escobar* (1992) 3 Cal.4th 740, 750.)

Here, sufficient evidence supported the jury's finding that defendant inflicted great bodily injury. Defendant strangled A.A. until she lost consciousness. Furthermore, she remained unconscious long enough for defendant to pack their belongings. Dr. Dugan testified that 32,000 brain cells and 230 million [*sic*] neural connections are destroyed for every second of unconsciousness from strangulation. The loss is permanent. A person strangled to unconsciousness will not only lack memory of the time the person was unconscious but also may have difficulty forming new memories. These symptoms may be delayed for hours, weeks, months, or years.

Significantly, Dr. Dugan also testified that strangulation to unconsciousness is never a minor injury. The jury was instructed that great bodily injury means "an injury that is greater than minor or moderate harm." We presume the jury followed these instructions. (*People v. Lindberg* (2008) 45 Cal.4th 1, 26.) Thus, the jury must have

found the loss of consciousness was not a "minor or moderate harm." (See *People v. Guiton* (1993) 4 Cal.4th 1116, 1127 [we presume the jury acted reasonably].)

We conclude that A.A's loss of consciousness when defendant strangled her was sufficient to support the jury's finding of great bodily injury. (See *People v. Wade, supra*, 204 Cal.App.4th at p. 1149.)

Defendant acknowledges that "loss of consciousness, by itself, has been found sufficient to constitute serious bodily injury," citing *People v. Wade, supra*, 204 Cal.App.4th at page 1150. (See also § 243, subd. (f)(4) [" 'Serious bodily injury' means a serious impairment of physical condition" including "loss of consciousness"].) Defendant argues there is an important distinction between serious bodily injury and great bodily injury, noting the California Supreme Court in *Cabrera* held that "the terms, in fact, 'have separate and distinct statutory definitions,' " and thus "not all jury findings of serious bodily injury necessarily entail a finding of great bodily injury." (*Cabrera, supra*, 14 Cal.5th at pp. 484, 488.)

Defendant ignores the high court's statement in *Cabrera* that its "holding in this case does not call into question . . . that serious bodily injury and great bodily injury are ' "essentially equivalent elements" ' " (*Cabrera, supra*, 14 Cal.5th at p. 490.) The court in *Cabrera* focused on the higher "degree of similarity" (*id.* at p. 491) required by *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*). (*Cabrera*, at p. 483 [" 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to the jury, and proved beyond a reasonable doubt,' " quoting *Apprendi*, at p. 490].) The court held that the sentencing court violated *Apprendi* when it concluded there was great bodily injury based solely on the jury's finding of serious bodily injury, where the jury was unable to reach a verdict on great bodily injury allegations. (*Cabrera*, at p. 480.)

Tellingly, the *Cabrera* court said: "Even if it is sufficient for serious bodily injury and great bodily injury to be '*substantially* the same' [citation] for purposes of applying

7

Penal Code section 12022.7, more is required to satisfy" *Apprendi*. (*Cabrera, supra*, 14 Cal.5th at p. 491.) It follows that the distinction between serious bodily injury and great bodily injury required by *Apprendi* does not apply for purposes of applying section 12022.7. In any event, in this instance, unlike *Cabrera*, the jury found that defendant inflicted great bodily injury under section 12022.7, and, on that basis, the trial court imposed a four-year sentence on the enhancement. The *Cabrera* court said that "[w]hat matters is whether the jury has found that defendant inflicted great bodily injury . . . ." (*Cabrera*, at p. 490.) Here, the jury did find that defendant inflicted great bodily injury. Thus, *Cabrera* does not support a distinction between serious bodily injury and great bodily injury in this case.

## II

### *Sentence On Count 7*

The parties agree that the prison term the trial court orally imposed on count 7 at the sentencing hearing differs from that reflected in the abstract of judgment. Defendant was charged in count 7 with violating section 273.5, subdivisions (a) and (f). The allegation in subdivision (f) reflected that defendant has, within the past seven years suffered a prior conviction in violation of section 243, subdivision (e)(1). Thus, the sentence for a conviction in count 7 provided for a state prison sentence of two, three, or four years. (§ 273.5, subd. (f)(2).) In imposing sentence, the trial court sentenced defendant to the middle term of three years at the hearing, but the abstract of judgment incorrectly reflects a middle term of two years. "[W]here there is a discrepancy between the oral pronouncement of judgment and the abstract of judgment, the oral pronouncement controls." (*People v. Burke* (2023) 89 Cal.App.5th 237, 244; see *People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.) Accordingly, we will order the trial court to correct the abstract of judgment to reflect a three-year term on count 7, consistent with the oral pronouncement of judgment. (*Burke*, at p. 244.)

8

DISPOSITION

The judgment is affirmed.  The trial court is directed to correct the abstract of judgment to correctly reflect the imposition of sentence on count 7 as the middle term of three years and forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

_____/s/_____
EARL, P. J.

We concur:

_____/s/_____
RENNER, J.

_____/s/_____
MESIWALA, J.

9